UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-80033-CR-MIDDLEBROOKS/BRANNON

UNITED STATES OF AMERICA

v.

KENNY CHATMAN,

    **Defendant.**
_____/

## FACTUAL PROFFER

    Defendant Kenneth Chatman, his counsel, and the United States agree that, had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt, and the following facts are true and correct and are sufficient to support a plea of guilty:

    1.    At all times relevant to the Indictment, substance abuse treatment was regulated under state and federal law. Pursuant to Florida's Marchman Act, appropriate substance abuse treatment needed to be "a professionally directed, deliberate, and planned regimen of services and interventions that are designed to reduce or eliminate the misuse of drugs and alcohol and promote a healthy, drug-free lifestyle." Fl. Stat. 397.311(a).

    2.    At all times relevant to the Indictment, the Marchman Act made it unlawful for any person or agency to act as a substance abuse service provider unless it was properly licensed. Fl. Stat. § 397.401(1); Fl. Admin. Code § 65D-300.003(1)(a).

    3.    To insure the legitimacy of substance abuse service providers and to protect the health and welfare of patients, all substance abuse service provider personnel who had contact with patients, owners, directors, and chief financial officers had to pass a "level 2 background screening," including "fingerprinting for statewide criminal history records checks through the Department of Law Enforcement, and national criminal history records checks through the Federal Bureau of Investigation." Fl. Stat. §§ 397.451(1)(a)(1), 435.04(1)(a). The Act also made it a criminal offense to operate or attempt to operate as a service provider with personnel who did not pass the background test. Fl. Stat. § 397.403(1)(e)(1); 397.461. Despite these laws, the substance abuse treatment centers mentioned in the Indictment, Journey to Recovery ("Journey") and Reflections Treatment Center ("Reflections"), applied for and received licenses and operated as service providers by hiding the fact that defendant Kenneth Chatman, who had a prior federal felony conviction, owned Journey and Reflections and was their Chief Operating Officer.

    4.    The Patient Protection and Affordable Care Act of 2010 ("ACA"), Pub. L. 111-148, and other federal laws expanded the availability of private insurance to pay for substance

Page 1 of 9

abuse treatment in several ways. First, the ACA allowed parents to maintain health insurance for their children through their own insurance policies until the children reached the age of 26. Second, federal law mandated that substance abuse treatment and other mental health treatment must be covered and reimbursed by insurance policies in the manner and at the same levels as other medical treatment. Third, the ACA required insurance companies to cover individuals regardless of prior existing conditions. Fourth, annual and lifetime caps on coverage were removed. Fifth, the ACA created insurance exchanges that allowed uninsured individuals to apply for and obtain coverage from private insurers. The combination of these provisions created insurance coverage for patients and substance abuse treatment that had previously been excluded from coverage. Federal health care benefits programs were likewise expanded.

5. These federal laws created access to coverage through a number of avenues, including health plans sponsored by private employers, federal health care benefits programs, and health plans offered directly by private insurance companies. Private insurance companies administer health plans sponsored by private employers and governmental employers. Health plans sponsored by private employers are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, while those sponsored by governmental employers and certain others are exempted from ERISA's jurisdiction.

6. The Federal Employees Health Benefits Program ("FEHBP") provided medical benefits, items and services to federal employees and their dependents, including substance abuse services. The United States Office of Personnel Management ("OPM") managed the FEHBP and contracted with various insurance companies to offer these benefits. FEHBP reimbursed those insurance companies out of government funds for the money the insurance companies paid out for medical benefits, items and services for federal employees and their dependents. BlueCross/BlueShield (BCBS) was one of the various insurance companies contracted by the Office of Personnel Management to offer medical benefits, items and services to federal employees under the FEHBP.

7. The National Railroad Passenger Corporation, doing business as Amtrak ("Amtrak"), was a private, for profit, Government corporation, that operated a nationwide system of passenger rail transportation. As part of its employee benefits package, Amtrak established employee health and welfare benefit plans to provide healthcare to their employees, including their spouses, domestic partners, and dependent children (collectively, "dependents").

8. Both ERISA and non-ERISA health benefit plans, including ACA plans, were offered or administered by private insurance companies, including Blue Cross/Blue Shield, Aetna, Cigna Behavioral Health, Cigna Health & Life Insurance Company, United Behavioral Health, and United Health Group.

9. All of these health benefit plans were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b), that is, "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

10. Regardless of the type of plan held by a patient, the amount of coverage and terms and conditions of billing and payment were governed by the terms of the individual's insurance

documents, and the insurance company administering the plan had the authority, responsibility, and discretion to make coverage determinations and to process and make payments on claims.

11. Chapter 817 of the Florida Statutes, known as the "Florida Patient Brokering Act," made it a felony for any person, health care provider, or health care facility, including any licensed substance abuse service provider, to: "(a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility; (b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to or from a health care provider or health care facility; (c) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility; or (d) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), paragraph (b), or paragraph (c)." Fla. Stat. § 817.505.

12. Florida law also stated that it "shall constitute a material omission and insurance fraud . . . for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge." Fla. Stat. § 817.234(7)(a).

13. Under state and federal law, health benefit plans were only responsible for claims for services that: (a) were "medically necessary," (b) were actually and lawfully rendered; (c) were provided by a properly licensed service provider, and (d) complied with the terms of the health care plan, including the obligation to pay co-insurance and deductibles.

14. Bodily fluid testing could be used to detect recent drug or alcohol use by a client by conducting various tests on a client's urine, blood, and saliva. Urine Analysis or urinalysis ("UA") testing complexity ranged from screening tests – also known as point of care ("POC") testing – which provided instant results, to confirmatory testing, which was sent to a laboratory, for more complex analysis. Laboratories could also conduct complex analysis on blood and saliva samples.

15. Like other medical tests, bodily fluid testing could be billed to insurance and reimbursed pursuant to the terms of the insurance policy. Insurance companies were only responsible for claims for testing that were "medically necessary," actually performed, properly prescribed, and lawfully conducted by a properly licensed service provider, and conducted and billed in compliance with the law and the terms of the health care plan, including the obligation to pay co-insurance.

16. POC urine testing involved collecting a client's urine in a specific cup designed for testing. The specimen was analyzed using a color banded or numbered dipstick, allowing for visual positive or negative results. POC urine testing usually tested for the presence of 9 to 13 specific types of drugs, including the most common drugs of abuse like cocaine, opioids, and

heroin. POC tests typically cost between $5 and $10 and could be read easily by a layperson.

17. Confirmatory testing, conducted in a laboratory setting, made use of gas liquid chromatography, mass spectrometry, and/or gas chromatography, or high performance liquid chromatography, to analyze the client's urine, blood, or saliva specimen. These techniques were highly sensitive, and accurately and definitively identified specific substances and the quantitative concentrations of the drugs or their metabolites. Confirmatory testing could detect a wider range of controlled substances and metabolites – up to 100 or more substances, referred to as "panels." The prescribing physician could request that the lab test only for those panels that directly related to a client's drug use history. Laboratories billed each panel separately, so prescribing more panels for testing resulted in higher bills.

18. Reflections was located at 5100 Coconut Creek Parkway, Margate, Florida, in Broward County, in the Southern District of Florida. Reflections purported to operate as a licensed "substance abuse service provider" or "treatment center," that is, it purportedly offered clinical treatment services for persons suffering from alcohol and drug addiction. As noted above, although defendant Kenneth Chatman had a federal criminal conviction that prohibited him from owning or operating a substance abuse service provider, Kenneth Chatman owned and served as the Chief Operating Officer of Reflections, including making all financial decisions. Defendant Kenneth Chatman and co-defendant Laura Chatman ("LChatman") agreed to place LChatman's name on Reflections documentation as the owner in an attempt to hide Kenneth Chatman's true ownership and control over the business.

19. Journey was located at 7451 S. Military Trail, Lake Worth, Florida, in Palm Beach County, in the Southern District of Florida. Journey purported to operate as a licensed "substance abuse service provider" or "treatment center," that is, it purportedly offered clinical treatment services for persons suffering from alcohol and drug addiction. As noted above, although defendant Kenneth Chatman had a federal criminal conviction that prohibited him from owning or operating a substance abuse service provider, Kenneth Chatman owned and served as the Chief Operating Officer of Journey, including making all financial decisions. Kenneth Chatman and LChatman agreed to place LChatman's name on Journey's documentation as the owner in an attempt to hide Kenneth Chatman's true ownership and control over the business.

20. On January 18, 2014, LChatman submitted documentation to the Florida Department of Children and Families ("DCF") for the application of licensure for Reflections in Broward County, in the Southern District of Florida. DCF licensure was needed to provide substance abuse treatment and to bill insurance companies and, hence, the application was in connection with the delivery of health care services. LChatman listed herself as the sole owner of Reflections and concealed the fact that Kenneth Chatman, a convicted felon, was an owner and director of Reflections. LChatman signed and submitted these documents to DCF knowing that they were false and fraudulent, knowing that the failure to disclose Kenneth Chatman's role was material, and knowing that DCF would rely upon her representations in making a decision regarding licensure.

21. The defendant hired co-conspirator Barry Gregory as a consultant to assist in obtaining licensure for Reflections and Journey. Gregory also knew that Kenneth Chatman could

not serve as the owner and director of Reflections and Journey. Gregory and LChatman signed and submitted documents to DCF and other accrediting agencies in order to conceal Kenneth Chatman's ownership and management of Reflections and Journey. LChatman appeared at Reflections and Journey for audits and inspections by DCF and other accrediting agencies to make it seem as though LChatman was the sole owner and Chief Executive Officer and Chief Financial Officer of Reflections and Journey knowing that DCF and the other accrediting agencies would rely upon LChatman's representation that she was the owner, CEO, and CFO in making their decisions. LChatman also filed corporate documents and opened bank accounts in the names of Reflections and Journey to allow Kenneth Chatman and other members of the conspiracy to deposit proceeds from the health care fraud scheme and to conduct transactions meant to promote the health care fraud scheme.

22. In addition to the above mentioned treatment centers, Defendant Kenneth Chatman also owned and operated a series of "recovery residences," also known as "sober homes," one of which operated under the name of Stay'n Alive, Inc. ("Stay'n Alive"). The Stay'n Alive residence was located at 10102 Patience Lane, Royal Palm Beach, Florida, in the Southern District of Florida. Defendant Kenneth Chatman was listed as President of the company along with co-defendant LChatman listed as the Vice-President of the company according to records filed with the State of Florida.

23. Defendant Kenneth Chatman also operated another group of sober homes identified as Total Recovery Sober Living LLC ("Total Recovery"). One of the Total Recovery sober homes was located at 3401 Westview Avenue, West Palm Beach, Florida, in the Southern District of Florida and another was located at 1130 48th Street, West Palm Beach, Florida, in the Southern District of Florida. Although the business incorporation documents were in the name of co-defendant Fransesia Davis ("Davis"), defendant Kenneth Chatman was the true owner of Total Recovery. Kenneth Chatman and Davis agreed to place Davis' name on Total Recovery documentation as the owner in an attempt to hide Kenneth Chatman's true ownership and control over the business.

24. In addition to the above mentioned sober homes, Defendant Kenneth Chatman also controlled several other multi-bed residences operating as sober homes in Palm Beach ~~and~~ County ~~Broward Counties~~, all in the Southern District of Florida.

25. As the owner and operator of the above mentioned treatment facilities and sober homes, Defendant Kenneth Chatman managed all aspects of these facilities including the hiring and firing of personnel; admitting and discharging patients and making financial decisions.

26. In addition to owning and operating these sober homes, Kenneth Chatman conspired with owners and operators of other sober homes, including co-defendants Davis and Michael Bonds, to obtain patients for Reflections and Journey who would receive ineffective and medically unnecessary substance abuse treatment and testing that could be billed to the patients' insurance in order to enrich Chatman and the members of the conspiracy. To achieve this goal, defendant Kenneth Chatman paid kickbacks and bribes to sober home owners for referring their residents to Reflections and Journey for treatment, and disguised these kickbacks and bribes as "case management fees," "consulting fees," "marketing fees," and "commissions." The co-

conspirator sober home owners met with Chatman on a weekly basis to collect their kickbacks and bribes, which were paid based on the number of insured patients that received treatment each week.

27.     The defendant further knew that bribes and kickbacks were paid to insured patients who attended treatment, in the form of free or reduced rent, cigarettes, illicit and prescription drugs, and other items. The defendant further marketed Reflections and Journey and his sober homes as places where patients could receive free rent and continue to use drugs while purportedly receiving substance abuse treatment, so long as the defendant could bill their insurance companies. With some patients, when the patient's insurance was about to run out, the defendant provided the patient with drugs. The patient would then have a positive drug test result and would appear to have "relapsed." The defendant would then ask the patient's insurance company to authorize additional treatment, allowing Reflections and Journey to continue billing for additional ineffective treatment and testing.

28.     Defendant Kenneth Chatman dictated which patients were admitted and discharged and the type and frequency of different types of lab testing that would be performed based upon the kickbacks and bribes that he was receiving from different clinical laboratories rather than based upon the individual patients' needs. Chatman dictated that confirmatory urine drug testing on dozens of panels for street and prescription drugs would be performed three days per week, duplicative saliva drug testing would occur, and every patient would receive DNA and allergy testing regardless of whether patients complained of allergies. These tests were medically unnecessary and not used to direct the treatment of the patients. Many of the test results were never reviewed and new samples were submitted before older results were received and reviewed.

29.     The defendant knew, based upon drug test results, patient statements, and observations, that Reflections and Journey patients were continuing to use controlled substances. Kenneth Chatman would overrule the advice of co-conspirator Gregory and others when they recommended referring relapsed patients to detox or other facilities that would truly assist the patients in achieving sobriety. Defendant Chatman, who had no medical or clinical training, would overrule the recommendations from Gregory and other co-conspirators because discharging the patients would end Chatman's ability to bill the patients' insurance plans. Co-conspirator Gregory estimated that as many as 90% of the patients continued to use controlled substances while purportedly obtaining treatment.

30.     With regard to bodily fluid testing, based upon Chatman's instructions, "standing orders" were prepared and provided by clinical labs. Rather than selecting individual drug tests based upon a patient's drug use history, period of sobriety, or any other individualized evaluation, Reflections' Medical Directors, signed these "standing orders" that authorized testing patients before the patients had even seen the doctor, including conducting duplicate tests of patients' urine and saliva.

31.     In many instances, the sober home residents did not attend the purported treatment sessions at Reflections and Journey and did not provide bodily fluid samples for drug testing. On some of these occasions, co-conspirators would forge patients' signatures on sign-in sheets to make it appear as though absent patients had attended treatment and submitted bodily fluids samples. Members of the clinical staff would "cut and paste" to create treatment notes that made

it appear as though the absent patients were present.

32. Defendant Kenneth Chatman directly and indirectly solicited and received kickbacks and bribes from co-defendant Stefan Gatt ("Gatt") and other co-conspirator clinical laboratory agents and employees for sending the lab tests related to patients of Reflections and Journey to the clinical laboratories that, in turn, would bill the patients' Insurance Plans. These kickbacks and bribes were sometimes disguised as dividends, marketing fees, and commissions to "sales reps" that Chatman himself would select, knowing that the "sales rep" would pay most or all of his "commission" to Chatman.

33. Kenneth Chatman agreed to use American Clinical Solutions ("ACS") located in Sun City Center, Florida, in the Middle District of Florida, to perform confirmatory drug testing for the clients of Reflections. Co-defendant Gatt was an employee of ACS as a lab representative. ACS offered bodily fluid testing services, including confirmatory testing using urine and saliva. Chatman informed Gatt that testing would be performed three days per week. ACS paid commissions to Gatt based upon the number of samples that he collected. Without the knowledge of ACS management, Gatt used monies from his commission payments to pay kickbacks to the defendant.

34. When the defendant became dissatisfied with the amount of money that Gatt was paying him as kickbacks, the defendant moved the urine testing to a number of different labs in exchange for kickbacks and bribes that were paid in cash, check, and goods and services. Chatman allowed Gatt to continue taking saliva samples to ACS for duplicative testing in exchange for kickbacks and bribes. When ACS management learned of the defendant's demands for kickbacks and bribes from Gatt, ACS stopped performing testing on samples from Reflections. The defendant then moved saliva testing to another lab that would pay kickbacks and bribes.

35. "Standing orders" and other documentation were prepared and provided by the clinical labs. Rather than selecting individual drug tests based upon a patient's drug use history, period of sobriety, or any other individualized evaluation, co-conspirator Medical Directors, including co-defendants Joaquin Mendez and Donald Willems, signed "standing orders" and standardized prescriptions that authorized testing patients before the patients had even seen the doctor and specified that the labs would perform dozens of drug-testing panels.

36. Based on these standing orders and standardized prescription, co-defendant Gatt and other co-conspirators collected urine and saliva samples from Reflections and Journey and took them to labs for testing. Defendant Kenneth Chatman ordered employees of Reflections and Journey, including co-defendant Davis, to submit urine and saliva samples in lieu of absent patients and former patients because the kickbacks and bribes to Chatman were calculated based upon the number of samples that he submitted. The defendant knew that the substituted samples would be delivered to the labs for testing and further knew that insurance claims for those tests would be submitted to the absent patients' insurance companies.

37. Neither Chatman nor any of the labs disclosed to insurance companies that Chatman was referring the bodily fluid testing in exchange for bribes and kickbacks, that the co-conspirator sober home owners were referring their residents to Reflections and Journey for

treatment in exchange for bribes and kickbacks, or that Reflections and Journey were giving kickbacks and bribes to patients to induce them to obtain treatment from Reflections and Journey. The members of the conspiracy also failed to inform the insurance companies that they were failing to collect co-pays and co-insurance in violation of the terms of the patients' insurance policies.

38. Defendant Kenneth Chatman and other co-conspirators recruited, enticed, harbored, transported, provided, obtained, and maintained some female patients into performing commercial sex acts. The defendant provided housing for the female patients, who would be made to perform sex acts in exchange for money that would then have to be paid to the defendant as "rent." The commercial sexual activity occurred at some of the sober homes controlled by the defendant or at hotels and motels that operated in interstate and foreign commerce. The defendant provided condoms that were manufactured outside the state of Florida and the defendant and co-conspirators advertised and caused the advertisement of the commercial sexual activity via cellular telephones and the internet on websites like Craig's List and Backpage.com. The defendant and co-conspirators provided controlled substances to these addicted patients to induce them to perform sexual acts. Chatman also used intimidation tactics and threats of legal process, including evicting the patients from his sober homes (thereby leaving them homeless) to maintain their compliance. The patients that engaged in this activity were not required to attend treatment at Reflections or provide bodily fluid samples for testing but Chatman submitted and caused the submission of claims to the patients' Insurance Plans for substance abuse treatment and testing that they did not receive.

39. Kenneth Chatman maintained control over patients who attended Reflections and Journey by threats and confiscating their belongings, car keys, telephones, medications and food stamps, in order to maintain the ability to continue billing their Insurance Plans.

40. Defendant Kenneth Chatman knew that insurance claims based upon the fraudulent and medically unnecessary drug testing and treatment were submitted to patients' health insurance plans. During the duration of Reflections and Journey, the treatment centers and labs submitted insurance claims that resulted in reimbursement payments of between $9.5 million and up to $25 million.

41. The proceeds of the health care fraud scheme were deposited into bank accounts that the defendant and co-defendant Laura Chatman opened accounts at Wells Fargo Bank in the names of Reflections and Journey. Wells Fargo is a domestic financial institution as defined by federal law involved in interstate or foreign commerce. The defendant and co-conspirators agreed to use the proceeds to promote the ongoing fraud scheme. The bank account opening documents for the accounts opened on behalf of Reflections and Journey listed Kenneth Chatman as an authorized signor and owner.

42. Kenneth Chatman and co-conspirators conducted transactions from the Wells Fargo accounts to promote the ongoing fraud, including making kickback and bribe payments in the form of checks to sober home owners, including co-defendant Michael Bonds. These checks were for the referral of insured clients to Reflections for treatment and noted that they were for "case management." Chatman and his co-conspirators also made payments to the medical directors, clinical directors, employees, and others to continue their involvement with the fraud.

Monies from these accounts also were used to pay kickbacks and bribes to patients, including providing prescription and illicit drugs to patients and potential patients.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 3/15/2017         By: _____
                            A. MARIE VILLAFAÑA
                            ASSISTANT UNITED STATES ATTORNEY

Date: 3-15-2017         By: _____
                            SAAM ZANGENEH, ESQ.
                            ATTORNEY FOR DEFENDANT

Date: 3-15-2017         By: _____
                            KENNETH CHATMAN, DEFENDANT