UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-80013-CR-MIDDLEBROOKS/BRANNON

UNITED STATES OF AMERICA

v.

DONALD WILLEMS,

      **Defendant.**
_____/

## FACTUAL PROFFER

      Defendant Donald Willems, his counsel, and the United States agree that, had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt, and that the following facts are true and correct and are sufficient to support a plea of guilty:

      1.    At all times relevant to the Indictment, substance abuse treatment was regulated under state and federal law. Pursuant to Florida's Marchman Act, appropriate substance abuse treatment needed to be "a professionally directed, deliberate, and planned regimen of services and interventions that are designed to reduce or eliminate the misuse of drugs and alcohol and promote a healthy, drug-free lifestyle." Fl. Stat. 397.311(a).

      2.    At all times relevant to the Indictment, the Marchman Act made it unlawful for any person or agency to act as a substance abuse service provider unless it was properly licensed. Fl. Stat. § 397.401(1); Fl. Admin. Code § 65D-300.003(1)(a).

      3.    To insure the legitimacy of substance abuse service providers and to protect the health and welfare of patients, all substance abuse service provider personnel, including all owners, directors, and chief financial officers, had to pass a "level 2 background screening," including "fingerprinting for statewide criminal history records checks through the Department of Law Enforcement, and national criminal history records checks through the Federal Bureau of Investigation." Fl. Stat. §§ 397.451(1)(a)(1), 435.04(1)(a). The Act also made it a criminal offense to operate or attempt to operate as a service provider with personnel who did not pass the background test. Fl. Stat. § 397.403(1)(e)(1); 397.461. Despite these laws, the substance abuse treatment centers mentioned in the indictment, Journey to Recovery and Reflections Treatment Center, applied for and received licenses and operated as service providers by hiding the fact that co-defendant Kenneth Chatman, who had a prior federal felony conviction, owned Journey and Reflections and was their Chief Operating Officer.

      4.    The Patient Protection and Affordable Care Act of 2010 ("ACA"), Pub. L. 111-148, and other federal laws expanded the availability of private insurance to pay for substance abuse treatment in several ways. First, the ACA allowed parents to maintain health insurance for their

children through their own insurance policies until the children reached the age of 26. Second, federal law mandated that substance abuse treatment and other mental health treatment must be covered and reimbursed by insurance policies in the manner and at the same levels as other medical treatment. Third, the ACA required insurance companies to cover individuals regardless of prior existing conditions. Fourth, annual and lifetime caps on coverage were removed. Fifth, the ACA created insurance exchanges that allowed uninsured individuals to apply for and obtain coverage from private insurers. The combination of these provisions created insurance coverage for patients and substance abuse treatment that had previously been excluded from coverage. Federal health care benefits programs were likewise expanded.

5. These federal laws created access to coverage through a number of avenues, including health plans sponsored by private employers, federal health care benefits programs, and health plans offered directly by private insurance companies. Private insurance companies administer health plans sponsored by private employers and governmental employers. Health plans sponsored by private employers are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, while those sponsored by governmental employers and certain others are exempted from ERISA's jurisdiction.

6. The Federal Employees Health Benefits Program ("FEHBP") provided medical benefits, items and services to federal employees and their dependents, including substance abuse services. The United States Office of Personnel Management ("OPM") managed the FEHBP and contracted with various insurance companies to offer these benefits. FEHBP reimbursed those insurance companies out of government funds for the money the insurance companies paid out for medical benefits, items and services for federal employees and their dependents. BlueCross/BlueShield (BCBS) was one of the various insurance companies contracted by the Office of Personnel Management to offer medical benefits, items and services to federal employees under the FEHBP.

7. The National Railroad Passenger Corporation, doing business as Amtrak ("Amtrak"), was a private, for profit, Government corporation, that operated a nationwide system of passenger rail transportation. As part of its employee benefits package, Amtrak established employee health and welfare benefit plans to provide healthcare to their employees, including their spouses, domestic partners, and dependent children (collectively, "dependents").

8. Both ERISA and non-ERISA health benefit plans, including ACA plans, were offered or administered by private insurance companies, including Blue Cross/Blue Shield, Aetna, Cigna Behavioral Health, Cigna Health & Life Insurance Company, United Behavioral Health, and United Health Group.

9. All of these health benefit plans were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b), that is, "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

10. Regardless of the type of plan held by a patient, the amount of coverage and terms and conditions of billing and payment were governed by the terms of the individual's insurance documents, and the insurance company administering the plan had the authority, responsibility, and

discretion to make coverage determinations and to process and make payments on claims.

11. Chapter 817 of the Florida Statutes, known as the "Florida Patient Brokering Act," made it a felony for any person, health care provider, or health care facility, including any licensed substance abuse service provider, to: "(a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility; (b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to or from a health care provider or health care facility; (c) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility; or (d) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), paragraph (b), or paragraph (c)." Fla. Stat. § 817.505.

12. Florida law also stated that it "shall constitute a material omission and insurance fraud . . . for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge." Fla. Stat. § 817.234(7)(a).

13. Under state and federal law, health benefit plans were only responsible for claims for services that: (a) were "medically necessary," (b) were actually and lawfully rendered; (c) were provided by a properly licensed service provider, and (d) complied with the terms of the health care plan, including the obligation to pay co-insurance and deductibles.

14. Bodily fluid testing could be used to detect recent drug or alcohol use by a client by conducting various tests on a client's urine, blood, and saliva. Urine Analysis or urinalysis ("UA") testing complexity ranged from screening tests – also known as point of care ("POC") testing – which provided instant results, to confirmatory testing, which was sent to a laboratory, for more complex analysis. Laboratories could also conduct complex analysis on blood and saliva samples.

15. Like other medical tests, bodily fluid testing could be billed to insurance and reimbursed pursuant to the terms of the insurance policy. Insurance companies were only responsible for claims for testing that were "medically necessary," actually performed, properly prescribed, and lawfully conducted by a properly licensed service provider, and conducted and billed in compliance with the law and the terms of the health care plan, including the obligation to pay co-insurance.

16. POC urine testing involved collecting a client's urine in a specific cup designed for testing. The specimen was analyzed using a color banded or numbered dipstick, allowing for visual positive or negative results. POC urine testing usually tested for the presence of 9 to 13 specific types of drugs, including the most common drugs of abuse like cocaine, opioids, and heroin. POC tests typically cost between $5 and $10 and could be read easily by a layperson.

17. Confirmatory testing, conducted in a laboratory setting, made use of gas liquid chromatography, mass spectrometry, and/or gas chromatography, or high performance liquid chromatography, to analyze the client's urine, blood, or saliva specimen. These techniques were highly sensitive, and accurately and definitively identified specific substances and the quantitative concentrations of the drugs or their metabolites. Confirmatory testing could detect a wider range of controlled substances and metabolites – up to 100 or more substances, referred to as "panels." The prescribing physician could request that the lab test only for those panels that directly related to a client's drug use history. Laboratories billed each panel separately, so prescribing more panels for testing resulted in higher bills.

18. Reflections Treatment Center was located at 5100 Coconut Creek Parkway, Margate, Florida, in Broward County, in the Southern District of Florida. Reflections purported to operate as a licensed "substance abuse service provider" or "treatment center," that is, it purportedly offered clinical treatment services for persons suffering from alcohol and drug addiction. As noted above, although co-defendant Kenneth Chatman had a federal criminal conviction that prohibited him from owning or operating a substance abuse service provider, Chatman owned and served as the Chief Operating Officer of Reflections, including making all financial decisions.

19. Defendant Donald Willems was a licensed osteopathic doctor in the State of Florida, and was employed by Deerfield Medical Center. Through Deerfield Medical Center, Willems was hired to serve as medical director of Reflections Treatment Center from October 2015 to May 2016. As medical director, the defendant was purportedly responsible for evaluating patients, developing appropriate plans of treatment, and prescribing medically necessary treatment and testing.

20. Instead of defendant Willems using his medical expertise and his individual assessments of patients to decide what type of laboratory testing was needed by each patient, co-defendant Kenneth Chatman dictated the type and frequency of different types of lab testing that would be performed based upon the kickbacks and bribes that he was receiving from different clinical laboratories. Chatman dictated that confirmatory urine drug testing on dozens of panels for street and prescription drugs would be performed three days per week, duplicative saliva drug testing would occur, and every patient would receive DNA and allergy testing regardless of whether patients complained of allergies.

21. Based upon Chatman's instructions, "standing orders" were prepared and provided by clinical labs. Rather than selecting individual drug tests based upon a patient's drug use history, period of sobriety, or any other individualized evaluation, Reflections' Medical Directors, including defendant Willems, signed these "standing orders" that authorized testing patients before the patients had even seen the doctor, including conducting duplicate tests of patients' urine and saliva. In addition to the confirmatory drug testing, Willems authorized medically unnecessary allergy and DNA testing that patients did not request, and the results of which were never even shared with the patients. None of this testing could be billed to patients' insurance companies without defendant Willems' authorization.

22. To conceal the fact that these tests were not medically necessary, defendant Willems signed "medical necessity statements" after the fact that falsely stated that the testing was needed, that defendant Willems reviewed the test results, and that the tests were used to direct the course of

the patients' treatment. In truth, defendant Willems did not monitor the drug test results or use them to direct the patients' treatment. If Willems had, in fact, closely monitored the drug test results, he would have realized that most of the patients at Reflections were continuing to abuse drugs and that urine and saliva samples from other people were being substituted for the patients' urine and saliva samples. Willems knew that insurance claims for the medically unnecessary tests that he prescribed would be submitted to the patients' insurance companies.

23. In addition to receiving a salary based upon his work at Reflections, Willems and Deerfield Medical Center submitted bills to patients' insurance companies for exams performed by Willems. Willems and Deerfield Medical "upcoded" these bills, that is, the bills contained Current Procedural Terminology Codes ("CPT Codes") for examinations that were longer and more complex than those performed in order to increase the bills.

24. One of the additional services that Willems and Deerfield Medical was hired to provide to Reflections was the prescription of federally-approved opioids for the detoxification and treatment of persons suffering from opioid addiction. Defendant Willems surrendered his DEA number to the Drug Enforcement Administration following his arrest in 2012 for improperly prescribing controlled pain medications. Thus, Willems did not have the proper certifications from the Drug Enforcement Administration of the Department of Health and Human Services to prescribe those medications.

25. Despite his lack of certifications, defendant Willems prescribed controlled substances, including opioids, to patients at Reflections using DEA numbers assigned to other physicians and prescriptions that ~~were presigned by~~ contained the forged signature of another physician.

26. Willems knew that insurance claims based upon Willems' unlawful prescriptions for lab testing, prescription opioids, and other controlled substances, as well as the unlawful claims based upon the treatment occurring at Reflections and Willems' examinations were submitted to patients' health insurance plans. During the period of Willems' term as Medical Director at Reflections, clinical labs and Reflections billed insurance companies in excess of $28 million and received reimbursements from insurance companies in excess of $6.5 million.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 3/23/17    By: _____
                      A. MARIE VILLAFAÑA
                      ASSISTANT UNITED STATES ATTORNEY

Date: 3/23/17    By: _____
                      MAURICIO PADILLA, ESQ.
                      ATTORNEY FOR DEFENDANT

Date: 3/23/17    By: _____
                      DONALD WILLEMS, D.O., DEFENDANT