**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.   17-80013-CR-MIDDLEBROOKS/BRANNON**

**UNITED STATES OF AMERICA**

**v.**

**KENNETH CHATMAN,**

   **Defendant.**
_____/

**RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PRESENTENCE**
**INVESTIGATION REPORT (DE194) AND MOTION FOR VARIANCE (DE203)**

   The United States of America, by and through the undersigned Assistant United States Attorney, hereby files this Response to the Objections to the Presentence Investigation Report ("PSI") filed by defendant Kenneth Chatman (DE194) as well as his Motion for Variance from the Sentencing Guidelines (DE203).  Defendant Chatman ("Chatman") raises a number of factual objections and a series of objections to the Probation Officer's calculation of his advisory sentencing guidelines.  These are addressed in turn, by reference to the PSI paragraph numbers. Chatman also asks the Court to vary downward from the sentencing guidelines to a sentence of 151 months' imprisonment.  The United States addresses the § 3553(a) factors and their application to the defendant and makes its recommendation for a reasonable sentence.

   Page 4:  Chatman asserts that he has a high school diploma.  Chatman has repeatedly reported in debriefings that he only finished the 11th grade and left high school before graduating. Chatman provided the same information to the Pre-Trial Services officer at the time of his initial appearance, and to the Probation Officer in his PSI interview.  As set forth in ¶ 232 of the PSI,

1

Chatman received a GED from the State of Florida in 2011.   Counsel has provided the undersigned with a copy of a 2009 diploma from "Excel High School" in Minneapolis, MN, Tampa, FL, and New Orleans, LA.   This appears to be related to Chatman's GED.   It appears that this issue is resolved.

Chatman also objects to the inclusion of two "alias" dates of birth, and states that both of these dates are the birth dates of his father.   The government does not have any information that Chatman used these dates of birth in committing any offense, and has no objection to the removal of those dates of birth as "aliases."

¶ 39:   Chatman objects to the statement in paragraph 39 that he managed all aspects of Journey to Recovery, "including hiring and firing personnel, admitting and discharging patients, and making financial decisions."   Chatman admitted this in his factual proffer, which states:   "As the owner and operator of the above mentioned treatment facilities [including Journey to Recovery] . . . Defendant Kenneth Chatman managed all aspects of these facilities including the hiring and firing of personnel; admitting and discharging patients and making financial decisions." (DE135 at ¶ 25).   Chatman further admitted that he "owned and served as the Chief Operating Officer of Journey, including making all financial decisions."   (DE135 at ¶ 19).

¶¶ 47 & 76:   Chatman objects to the statement that he was the "true owner" of Total Recovery Sober Living, and that Fransesia Davis was the nominee owner in an attempt to hide Chatman's ownership and control over the business.   Chatman states that, if he were the true owner, he would not have had to pay Davis $49,000 in kickbacks.   If necessary, the United States will present testimony regarding statements of numerous witnesses that Chatman owned Total Recovery and comparing payments made to Davis (approximately $49,000) with Chatman's

2

kickback payments to persons who truly owned independent sober homes.   For example, co-defendant Michael Bonds received $240,000 in kickbacks, and other sober home owners have received substantially larger payments than Davis.   Chatman's own factual proffer states:

> Defendant Kenneth Chatman also operated another group of sober homes identified as Total Recovery Sober Living LLC ("Total Recovery").  . . . Although the business incorporation documents were in the namne of co-defendant Fransesia Davis ("Davis"), defendant Kenneth Chatman was the true owner of Total Recovery.   Kenneth Chatman and Davis agreed to place Davis' name on Total Recovery documentation as the owner in an attempt to hide Kenneth Chatman's true ownership and control over the business (DE135 at ¶ 23).

¶ 56:   Chatman re-iterates his objection to statements regarding his management of Journey to Recovery and his ownership of Total Recovery Sober Living.   For the reasons stated above with regarding to paragraphs 39 and 47, the Court should overrule these objections. Chatman also raises for the first time an objection to the statement that he managed all aspects of Reflections Treatment Center.   Chatman also admitted this in his factual proffer, which states: "As the owner and operator of the above mentioned treatment facilities [including Reflections Treatment Center] . . . Defendant Kenneth Chatman managed all aspects of these facilities including the hiring and firing of personnel; admitting and discharging patients and making financial decisions."   (DE135 at ¶ 25).   Chatman further admitted that he "owned and served as the Chief Operating Officer of Reflections, including making all financial decisions."   (DE135 at ¶ 18).

¶ 60:   Chatman objects to the statement that he "dictated which patients were admitted and discharged and the type and frequency of different types of laboratory testing," and asserts that "he conferred and made decisions with the assistance of his clinical director" (Objs. at 2).   While the United States does not dispute that, on occasion, Chatman and his clinical directors, including

Barry Gregory, conferred and reached mutual decisions, if necessary, the United States will present evidence of occasions where Chatman, who had no medical or clinical training, overruled the decisions of Gregory and other clinical staff.   The United States also notes that neither Chatman nor the clinical director had the authority to decide on laboratory testing.   That testing was required to be set and prescribed by the medical director.   Lastly, the United States notes that Chatman agreed in his factual proffer that he "dictated which patients were admitted and discharged and the type and frequency of different types of lab testing that would be performed based upon the kickbacks and bribes that he was receiving from different clinical laboratories rather than based upon the individual patients' needs" (DE135 at ¶ 28).

¶¶ 62 & 91:   Chatman objects to paragraph 62 regarding him overruling recommendations from Barry Gregory and others to refer relapsed patients to inpatient detox facilities.   According to Chatman, Gregory was receiving kickbacks of his own for referring sober home residents to Reflections and Journey (Objs. at 2).   The United States will present testimony that, during his three debriefings with agents, where Chatman was specifically asked about kickbacks from sober home owners to Reflections employees, Chatman never mentioned Gregory receiving kickbacks. Testimony also will be presented that Chatman's allegation is inconsistent with controlled calls placed by Gregory to sober home owners during the course of the investigation.   Regardless of Gregory's receipt of kickbacks, Chatman did, in fact, overrule recommendations of Gregory and other members of the clinical staff.   As stated in his factual proffer, Chatman "knew, based upon drug test results, patient statements, and observations, that Reflections and Journey patients were continuing to use controlled substances.   Kenneth Chatman would overrule the advice of co-conspirator Gregory and others when they recommended referring relapsed patients to detox or

4

other facilities that would truly assist the patients in achieving sobriety.   Defendant Chatman, who had no medical or clinical training, would overrule the recommendations from Gregory and other co-conspirators because discharging the patients would end Chatman's ability to bill the patients' insurance plans" (DE135 at ¶ 29).

¶ 67:   Chatman objects to paragraph 67 for failing to note that, after ACS refused to continue testing bodily fluid samples from Reflections, Stefan Gatt assisted Chatman in finding other labs, so that Chatman could obtain kickbacks and bribes.   Paragraph 67 relates to Chatman's involvement in the conspiracy, rather than Gatt's, which is discussed in paragraphs 114 and 125. Although not completely clear, paragraph 121 discusses Gatt's role in assisting Chatman in finding other labs that performed other types of testing and that would pay kickbacks and bribes.

¶ 73:   Chatman objects to paragraph 73 for suggesting that other members of the conspiracy deposited proceeds of this scheme into their bank accounts, and states that only the Chatmans were authorized to signed for the Reflections bank accounts.   The United States agrees that only the Chatmans were authorized signers on the Reflections bank accounts and the fraudulently obtained insurance proceeds were deposited into the Reflections bank accounts.   The Chatmans then distributed those proceeds to other members of the conspiracy and conducted other transactions to promote the criminal conspiracy via checks drawn on the Reflections bank accounts and cash withdrawn from those accounts.   (*See* DE135 at ¶¶ 41-42).

¶¶ 143 and 144:   Chatman objects to references to the overdose deaths of a series of patients and asserts that there is "no legal nexus between the overdose deaths of any of the patients referenced and Mr. Chatman or Reflections."   First, neither of the paragraphs states that there was a "legal nexus" between the overdose deaths.   The paragraphs report deaths suffered by

Reflections patients.   They are factually correct.   Evidence will also be presented at the time of sentencing regarding the deaths of M.F. and A.T.

Second, as part of his plea agreement, Chatman agreed that the two-level Guidelines enhancement for "conscious or reckless risk of death or serious bodily injury" applied.   See U.S.S.G. § 2B1.1(b)(15)(A); Plea Agrmt (DE134) at ¶ 7(b).   By agreeing to that enhancement, Chatman agreed that there was a preponderance of evidence showing that the offense involved a conscious or reckless risk of death or serious bodily injury and that Chatman knew or recklessly disregarded those risks.   The Eleventh Circuit has addressed this enhancement in the context of two Medicare fraud cases.   *See United States v. Mateos*, 623 F.3d 1350 (11th Cir. 2010); *United States v. Moran*, 778 F.3d 942 (11th Cir. 2015).   In *Moran*, the Eleventh Circuit noted that the "increase focuses on the defendant's disregard of risk, rather than on the result."   *Moran*, 778 F.3d at 977.   The Eleventh Circuit affirmed the application of the enhancement where the facility:

> admitted elderly patients with dementia, although the facility and staff were not equipped to meet the elderly patients' needs.   Moreover, the elderly patients with dementia were placed in a population that consisted mostly of chronic substance abusers.   [The facility] also failed to treat the substance-abuse issues in a meaningful way; dangerous drug relapses plagued much of the improperly treated substance-abusing patient population.   By knowingly failing to provide necessary treatment to patients, the appellants placed the patients at risk of death or serious bodily injury.

*Id.* at 978.   "[R]ecklessness is an objective standard, and . . . "reckless risk" [is used] to describe objectively culpable conduct.   . . . [A] defendant's conduct involves a conscious risk if the defendant was subjectively aware that his or her conduct created a risk of serious bodily injury, and a defendant's conduct involves a reckless risk if the risk of bodily injury would have been obvious to a reasonable person.   *United States v. Shengyang Zhou*, 717 F.3d 1139, 1151 (10th Cir. 2013).   Thus, for the "enhancement to apply, the risk of bodily injury [or death] must have been

known to the defendant or, if unknown to the defendant, the risk of bodily injury [or death] must have been the 'type of risk that is obvious to a reasonable person and for which disregard of said risk represents a gross deviation from what a reasonable person would do.'"  *United States v. Wolosz*, 485 F. App'x 509, 514 (2d Cir. 2012) (quoting *United States v. Lucien*, 347 F.3d 45, 56–57 (2d Cir. 2003)).

Pursuant to the health care fraud statute, 18 U.S.C. § 1347, where a defendant's "violation results in death," the defendant's statutory maximum sentence increases to life imprisonment, rather than ten years.   Chatman entered his guilty plea before the government's investigation into the deaths of Reflections' patients was completed, so Chatman's indictment was not superseded to add the sentencing enhancement.   Nonetheless, since Chatman argues that there is no "legal nexus" between the deaths mentioned in the PSI and Chatman or Reflections, it is worth discussing the causation standard that applies to section 1347's "resulting in death" enhancement.   The Eleventh Circuit has ruled that there is no foreseeability or proximate cause requirement into § 1347(a)'s penalty enhancement, and that the enhancement "requires nothing more than a causal connection factually."  *United States v. Webb*, 655 F.3d 1238, 1256 (11th Cir. 2011).

In *Webb*, the Eleventh Circuit specifically rejected the "proximate cause" requirement developed by the Sixth Circuit in *United States v. Martinez*, 588 F.3d 301 (6th Cir. 2009), but the discussion in *Martinez* is helpful because it shows that, even under the more exacting "proximate cause" standard, there is a "legal nexus" between the patient deaths and Chatman's fraud.   A "person is held responsible for all consequences proximately caused by his criminal conduct. Thus, where events are foreseeable and naturally result from one's criminal conduct, the chain of legal causation is considered unbroken."  *Martinez* at 318 (citation omitted).   Proximate cause

does *not* require immediacy or direct cause:

> The concept of proximate cause incorporates the notion that an accused may be charged with a criminal offense even though his acts were not the immediate cause of the victim's death or injury[;] . . . harm [need not be] directly caused by the acts of the defendant but rather result[] from intervening forces or events.  Where such intervening events are foreseeable and naturally result from the defendant's criminal conduct, the defendant is criminally responsible for the resulting harm.  . . . Therefore, even if [the defendant] did not intent for his two patients to die, he can be held responsible for their deaths if there was sufficient evidence that it reasonably might or should have been foreseen that his fraudulent conduct would be likely to create a situation which would expose another to the danger of death.

*Id.* (internal citations, quotations, and brackets omitted).

Third, a number of parents whose children overdosed will be presenting victim impact statements, and the United States is prepared to present patient medical files showing repeated positive drug tests without referrals to inpatient detox and testimony regarding statements from former patients and employees about Chatman providing drugs, encouraging drug use, and "relapsing" patients so that their insurance could continue to be billed.   As Chatman admitted in his factual proffer:

> The defendant further knew that bribes and kickbacks were paid to insured patients who attended treatment, in the form of free or reduced rent, cigarettes, illicit and prescription drugs, and other items.   The defendant further marketed Reflections and Journey and his sober homes as places where patients could receive free rent and continue to use drugs while purportedly receiving substance abuse treatment, so long as the defendant could bill their insurance companies.   With some patients, when the patient's insurance was about to run out, the defendant provided the patients with drugs.   The patient would then have a positive drug test result and would appear to have "relapsed."   The defendant would then ask the patient's insurance company to authorize additional treatment, allowing Reflections and Journey to continue billing for additional ineffective treatment and testing.
> . . .
> The defendant knew, based upon drug test results, patient statements, and observations that Reflections and Journey patients were continuing to use controlled substances.   Kenneth Chatman would overrule the advice of co-conspirator Gregory and others when they recommended referring relapsed patients to detox or other facilities that would truly assist the patients in achieving sobriety.

> Defendant Chatman, who had no medical or clinical training, would overrule the recommendations from Gregory and other co-conspirators because discharging the patients would end Chatman's ability to bill the patients' insurance plans (DE135 at ¶¶ 27, 29).

In short, Chatman owed a fiduciary duty, including a duty to provide his honest services, to the patients of the treatment facilities that he owned and operated. *See, e.g., United States v. DeVegter*, 198 F.3d 1324, 1329 (11th Cir. 1999) (private sector honest services fraud requires a finding that the defendant breached his duty of loyalty and contravened, that is, inherently harmed, "the purpose of the parties' relationship"). Chatman's fraud scheme deprived those patients of their intangible right to those honest services and numerous fatal and non-fatal overdoses resulted therefrom.

¶¶ 152 & 178: Chatman objects to the Probation Office's assessment of a four-level enhancement for role in the offense pursuant to U.S.S.G. § 3B1.1(a) and a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1 solely on the basis that the plea agreement does not contemplate these enhancements and the plea agreement states that neither party will seek any guidelines enhancements or reductions. Pursuant to the terms of the plea agreement, the United States is not asking the Court to apply either enhancement.

¶¶ 165-166: Chatman objects to "the[] factual accuracy" of Paragraphs 165 and 166. Paragraph 165 does not contain any facts, but merely sets forth the standard for applying an obstruction of justice enhancement. Accordingly, it is not inaccurate, although the United States is not asking the Court to apply that enhancement. Paragraph 166 contains accurate facts that relate to the crimes of conviction and should be included in the PSI and considered for purposes of 18 U.S.C. § 3553. The United States is prepared to present testimony and evidence related to those facts.

9

¶ 180:   Chatman objects to the Probation Office's determination that the Adjusted Offense Level for Group 1 is 36.   Chatman and the United States agreed in the Plea Agreement that the Adjusted Offense Level for Group 1 is 34.   The Probation Office's Offense Level includes a four-level enhancement for role in the offense (in ¶ 178), but neglects to include the two-level enhancement for a conviction under 18 U.S.C. § 1956 as set forth in U.S.S.G. § 2S1.1(b)(2)(B). Thus, if the Court were to apply the calculations set forth in the plea agreement, the Adjusted Offense Level for Group 1 is 34.

¶¶ 183-184, 186:   Chatman objects to the application of the vulnerable victim and role enhancements for Group 2, related to the sex trafficking of N.L.   The United States is not asking the Court to apply those enhancements.

¶¶ 187-204:   Chatman objects to the inclusion of Groups 3 through 5, which relate to the sex trafficking of S.H., L.R., and S.M.   At the time that the Plea Agreement was provided to Chatman, the United States was only prepared to proceed to trial as to the sex trafficking of a single victim.   Chatman did not immediately accept the plea agreement, and the United States continued its investigation accordingly.   In accordance with the terms of the Plea Agreement, all of the information later developed was provided to the Probation Office to include in the PSI, and the information is relevant to the factors contained in 18 U.S.C. § 3553.

¶¶ 205, 206, 208, 212:   Chatman objects to the Probation Office's calculation of the combined offense levels.   The United States agrees that, if the Court adopts the calculations contained in the Plea Agreement, the Total Offense Level is 33.

¶ 217:   Chatman argues that the Probation Office improperly applied two Criminal History points for committing the instant offense while under a criminal justice sentence for supervised

release.  Chatman admits that Stay'n Alive, one of his sober homes, was incorporated while he

was on supervised release, but avers that he "did not commit any illegal acts during this time (Objs.

at 6).  If necessary, the government will present testimony that Chatman admitted receiving

kickback payments for referring patients from Stay'n Alive to treatment facilities in exchange for

kickbacks.  In his factual proffer, Chatman admitted that he "owned and operated a series of

'recovery residences,' also known as 'sober homes,' one of which operated under the name of

Stay'n Alive, Inc." and he "managed all aspects of these facilities including the hiring and firing

of personnel; admitting and discharging patients and making financial decisions."  (DE135 at

¶¶ 22, 25).  Chatman also admitted that he "marketed . . . his sober homes as places where patients

could receive free rent and continue to use drugs while purportedly receiving substance abuse

treatment."  (DE135 at ¶  27).  Lastly, the indictment charges that the conspiracy to commit

health care fraud and the conspiracy to launder proceeds began "at least as early as August 2012"

– while Chatman was on supervised release – and Chatman pled guilty to those charges (*see* DE66

at ¶¶ 40, 46).  Accordingly, the Probation Office properly applied the two Criminal History points

and determined that Chatman's has four Criminal History points, resulting in a Criminal History

Category of III.

## THE APPLICATION OF THE FACTORS SET FORTH IN 18 U.S.C. § 3553 CALL FOR A SIGNIFICANT SENTENCE OF IMPRISONMENT

Defendant Chatman has filed a motion for a downward variance relying on the "parsimony

principle" and asking the Court not to "leave compassion and common sense at the door to the

courtroom."  (DE203 at 1-2 (quoting *United States v. Johnson*, 964 F.2d 124, 125 (2d Cir. 1992)).

In light of the fact that the final Guidelines calculation has not yet been determined, it is not clear

whether defendant Chatman's requested of 151 months' imprisonment (12-1/2 years) will be a

11

downward variance from the Guidelines, but regardless of the Guidelines that are calculated, the Court must fashion a "reasonable sentence" after considering the factors set forth in 18 U.S.C. § 3553.   After weighing all of those factors, the United States respectfully submits that the sentence requested by Chatman is insufficient.[1]

Last month, the Supreme Court discussed in detail the breadth of a sentencing court's discretion and how the factors in Section 3553(a) should be applied.   *See Dean v. United States*, ___ U.S. ___, 137 S. Ct. 1170 (2017).   While Chatman's PSI Objections ask the Court to disregard certain information, including the deaths of Reflections patients, the Supreme Court recognized that "[s]entencing courts have long enjoyed discretion in the sort of information they may consider when setting an appropriate sentence.   This durable tradition remains, even as federal laws have

---

[1] Chatman's motion suggests that, in the plea agreement, the parties jointly agreed to recommend a sentence of between 151 and 188 months' imprisonment (*see* DE203 at 10).   This is incorrect.   The parties specifically negotiated the last sentence of paragraph 6 of the Plea Agreement to allow each party to seek a variance from the advisory guideline range, however that guideline range is calculated by the Court.   That paragraph states:

> This Office [the U.S. Attorney's Office] reserves the right to inform the Court and the Probation Office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background.   Subject only to the express terms of any agreed-upon sentencing recommendations contained in this Agreement, the parties further reserve the right to make any recommendation as to the quality and quantity of punishment, *including any arguments regarding the application of the sentencing factors set forth in 18 U.S.C. § 3553.*"   (DE134 at ¶ 6 (emphasis added).)

If, however, the Court imposes an upward variance or upward departure from the guideline range that it establishes at the sentencing hearing, then the defendant is released from the appeal waiver in the plea agreement.   (DE134 at ¶ 16.)   Since the Probation Office has not adopted the calculations recommended by the parties and the advisory guideline range has not yet been determined, the United States cannot advise at this time whether it will seek a sentence below, within, or above the advisory guideline range established by the Court, but it will seek a sentence sufficient to reflect all of the factors set forth in § 3553.

required sentencing courts to evaluate certain factors when exercising their discretion." *Dean*, 137 S. Ct. at 1175 (citing *Pepper v. United States*, 562 U.S. 476, 487-89 (2011)).

The so-called "parsimony principle" generally "instructs courts to 'impose a sentence sufficient, but not greater than necessary to comply with' the four identified purposes of sentencing:   just punishment, deterrence, protection of the public, and rehabilitation."   *Id.* (quoting 18 U.S.C. § 3553(a)).   In doing so, the sentencing court is to "take into account 'the nature and circumstances of the offense and the history and characteristics of the defendant,' as well as 'the need for the sentencing imposed' to serve the four overarching aims of sentencing. The court must also consider the pertinent guidelines and policies adopted by the Sentencing Commission."   *Id.* (quoting 18 U.S.C. § 3553(a) and citing *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007)).   Chatman's motion addresses *only* the history and characteristics of the defendant and ignores all of the other factors in § 3553(a), and never addresses the four purposes of the sentencing.

The Eleventh Circuit also has explained that the "parsimony principle" is only one half of the statute's command:   the "requirement is not merely that a sentencing court when handing down a sentence be stingy enough to avoid one that is too long, but also that it be generous enough to avoid one that is too short.   . . . The reason that defense counsel and those who argue for shorter sentences . . . like the term 'parsimony principle' is that it tends to slant the discussion toward shorter sentences by emphasizing only that part of the twin requirements.   But terminology that is less than completely accurate should not be used to guide judicial decisions."   *United States v. Irey*, 612 F.3d 1160, 1197 (11th Cir. 2010).

Turning to the statutory factors, and using the framework of the Supreme Court and the

13

Eleventh Circuit, the Court has wide discretion in determining what term of imprisonment is a reasonable one below the statutory maximum term of imprisonment of life plus 30 years.

### 1.  The Nature and Circumstances of the Offenses

As set forth in the Indictment, the Factual Proffer, and the PSI, Chatman's crimes of conviction were extremely serious and were committed in a fashion more egregious than the usual circumstances.   Health care fraud is often considered a simple "white collar" offense, with Medicare or, at most, the taxpaying public, its only victim.   Chatman's offense was unlike this. Chatman placed greed above not just the general health of his patients, but above their mortality. Chatman did not simply solicit and accept kickbacks and bribes in violation of the law while providing worthwhile medical care.   Instead, Chatman: (a) marketed his "treatment facilities" and "sober homes" as places where addicts could continue using drugs while pretending to receive treatment so long as Chatman could bill their insurance; (b) actually provided drugs to addicts so that they would "relapse" and he could continue billing their insurance; (c) withheld suboxone and other prescription medications as "punishment"; and (d) used his position of power to sexually exploit his female patients.   As shown in the victim impact statements that have been submitted and will be submitted in advance of the sentencing and the in-court victim impact statements that will be made, Chatman's crime resulted in harm not normally encountered in health care fraud cases.   Patients died, leaving families mourning for their loved ones.   Desperate parents are left with feelings of guilt because they believed that they had entrusted their children to people, including Chatman, who would look out for their well-being.   Sex trafficking victims are left with post-traumatic stress disorder and lives that are permanently scarred.   Their attempts to overcome their drug addictions further hampered by Chatman's abuse of the recovery system.

14

### 2.   The History and Characteristics of the Defendant.

As noted above, Chatman's motion for downward variance discusses only this factor.   He portrays himself as a man dedicated to his family, but Chatman brought his wife into the criminal activity, having her sign documents to hide Chatman's ownership of the treatment facilities. Chatman also had his wife open bank accounts to allow the laundering of the criminal proceeds. And Chatman used his wife to appear at inspections and audits, including one that occurred shortly after the overdose death of one of the patients, to allow the fraud to continue.   Chatman also brought his then 18-year-old daughter into the business.   Chatman's decision to involve his daughter in the business exposed her to possible criminal prosecution – she was interviewed twice as part of the criminal investigation.   One of her jobs was inputting false information into the computer system to make it appear that medical doctors were reviewing patient files and prescribing testing and treatment.   Chatman opened bank accounts and a business in his young daughter's name, even making it appear that she was working as a "lab rep" to hide kickbacks that he was receiving from a lab, further exposing her to criminal health care fraud, money laundering, and tax liability.

It is also worth noting that two of the letters of support submitted by Chatman come from persons involved in the criminal activity.   James Woods was a "therapist" at Reflections.   The clinical director advised Chatman that Woods should be fired because he was simply "cutting and pasting" treatment notes from one patient to the next.   Chatman fired Woods but re-hired him within a few days and the practice continued.   Chatman also used Ladrell Climer as a "lab rep" to hide kickbacks and bribes that he was receiving from the lab.

Chatman's criminal record is not extensive, but he was on federal supervised release when

he began his involvement in this criminal conspiracy.   Chatman received a lenient sentence for his prior offense, due, in part, to his minimization of his role in the offense.   Chatman also reported to the Probation Officer that he used drugs while committing the offenses of conviction – these were some of the same drugs that he used to control the sex trafficking victims.

### 3.   Need to Reflect Seriousness/Promote Respect/Provide Just Punishment

The need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment weigh heavily in favor of a very significant term of imprisonment.   Chatman was one of the worst actors in a virtually industry-wide scheme to defraud insurance companies at the expense of patient health and safety.   Laws that were put in place to address the heroin and opioid crisis – namely, the Affordable Care Act and the Mental Health Parity and Addiction Equity Act – which made substance abuse treatment affordable and available to virtually everyone – were, instead, turned into a treasure trove for unscrupulous sober home owners, treatment facility providers, and labs, including Chatman.   Above and beyond the harm to individual patients and family that was discussed above, the effect on the insurance industry – and, hence, on persons and businesses trying to buy insurance – has been devastating. One measurable effect was Cigna's decision to leave the Florida ACA insurance exchange because of "an exponential increase in fraudulent and abusive" substance abuse treatment practices. Looking at the industry as a whole, this fraud scheme has resulted in fatal and non-fatal overdoses throughout Palm Beach County sometimes more than ten a day.   These practices harm young adults whose ability to protect themselves has been eroded by their addictions and whose parents have placed trust in sober homes and treatment facilities that advertise themselves as places that will heal their children.   When harm is directed to a group of defenseless citizens, it weighs in

favor of a significant sentence. *Cf. United States v. Lichtman*, ___ F. App'x ___, 2017 WL 1192199, *5 (11th Cir. Mar. 31, 2017).

### 4. Need to Afford Adequate Deterrence

The need to afford adequate deterrence also weighs in favor of a significant sentence. The Chatmans made several million dollars from their fraudulent billing of insurance companies, and Chatman received hundreds of thousands more in kickbacks from labs. Fraud schemes, in particular, lend themselves to potential defendants conducting a "cost-benefit analysis" and, hence, to general deterrence. If a defendant knows that he can make multi-millions in exchange for a risk of spending only a short time in prison, then the cost-benefit analysis weighs in favor of committing the fraud. Health care fraud in general, and health care fraud that endangers the lives of patients in particular, must be deterred through the imposition of adequate prison terms.

According to the Eleventh Circuit, "general deterrence is an important factor in white collar cases, where the motivation is greed . . . we have set aside sentences of little or no imprisonment because they do not constitute just punishment for the offense, do not promote respect for the law, and will not do much to deter similar criminal activity by others." *United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014). A light sentence conveys the message that "would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty," and accordingly do not constitute just punishment or promote respect for the law. *Id.* at 1310-11.

The Eleventh Circuit also found a sentence of time-served unreasonable in a health care fraud case because the defendant:

> did not receive so much as a slap on the wrist – it was more like a soft pat. . . .
> Such a sentence fails to achieve an important goal of sentencing in a white collar

crime prosecution – the need for general deterrence.   . . .

Insurance companies must rely on the honesty and integrity of medical practitioners in making diagnoses and billing for their services.   And as the government indicated at oral argument, deterrence is an important factor in the sentencing calculus because health care fraud is so rampant that the government lacks the resources to reach it all.   Thus, when the government obtains a conviction in a health care fraud prosecution, one of the primary objectives of the sentence is to send a message to other health care providers that billing fraud is a serious crime that carries with it a correspondingly serious punishment.

. . . Kuhlman's sentence sends the opposite message—it encourages rather than discourages health care providers from engaging in the commission of health care fraud because they might conclude that the only penalties they will face if they are caught are disgorgement and community service.

*United States v. Kuhlman*, 711 F.3d 1321 (11th Cir. 2013).

In considering this factor, the Court must also be mindful that Chatman committed not only the crimes of health care fraud and money laundering, but also the crime of sex trafficking.   The opioid epidemic has left many young women and men vulnerable to abuse, including enticement into sex trafficking, as they try to satisfy their addictions.   A significant sentence is required to deter sober home operators, drug dealers, and others from using the addicts' vulnerability to manipulate them into forced prostitution.

**5.   The Need to Protect the Public**

The need to protect the public from further crimes of the defendant also weighs in favor of a lengthy prison term.   Chatman previously received a lenient federal sentence and returned to crime – a more serious crime – while still on supervised release.   While Chatman is unlikely to re-commit this form of health care fraud, he has the capacity to re-commit offenses if he does not receive a sufficient sentence to specifically deter him from returning to a life of crime.   The Eleventh Circuit has approved a significant sentence based, in part, of the need to protect the

public, in a health care fraud case where no patients were actually harmed, but faced the potential for harm. *See United States v. Ramirez*, 491 F. App'x 65, 76-77 (11th Cir. 2012).

**6. Pertinent Policy Statements**

Pursuant to 18 U.S.C. § 3553(a)(5), the Court must consider "pertinent policy statements" issued by the Sentencing Commission. Some of those pertinent policy statements appear at U.S.S.G. §§ 5K2.1, 5K2.2, 5K2.3, 5K2.4, and 5K2.14. The United States is not seeking an upward departure pursuant to any of these guideline sections. Rather, pursuant to § 3553(a)(5), the United States notes that Chatman's criminal conduct encompasses a number of the Commission's policy statements in support of a significant period of incarceration.

**7. Need to Avoid Unwarranted Sentencing Disparities**

Section 3553(a)(6) mandates that courts consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." This appears to be the first federal health care fraud case that involves sex trafficking, so there are no known defendants who "have been found guilty of similar conduct." Looking to recent sex trafficking cases, in *United States v. Baston*, 818 F.3d 651 (11th Cir. 2016), the defendant became romantically involved with three women and then forced them into prostitution using force and threats of force. He was sentenced to 27 years' imprisonment and lifetime supervised release. *Id.* at 659. In *United States v. Cortes-Meza*, ___ F. App'x ___, 2017 WL 1352084 (11 th Cir. Apr. 13, 2017), the Eleventh Circuit affirmed a sentence of 40 years' imprisonment based upon a downward variance from a guideline range of life imprisonment. The defendant in *Cortes-Meza* was charged with forcing adult women and one minor into prostitution using force, fraud, and coercion and was convicted after trial. In *United States v. Canty*, 617 F. App'x 630 (8th Cir. 2015),

the court affirmed a downward variance from 324 months to 300 months of imprisonment for a defendant who used force, fraud, or coercion to trafficking a single minor victim.   In *United States v. Flanders*, 752 F.3d 1317 (11th Cir. 2014), the Court determined that life sentences were reasonable for a group of defendants convicted of conspiracy and substantive sex trafficking by fraud, who distributed controlled substances to their victims in order to induce them to produce pornographic videos that the defendants would distribute commercially.   In *United States v. Rivera*, 558 F. App'x 971 (11th Cir. 2014), the Court affirmed guideline sentences of 210 months and 262 months of imprisonment for co-conspirators who prostituted one sixteen-year-old victim. Lastly, in *United States v. Curtis*, 513 F. App'x 823 (11th Cir. 2013), the Court affirmed a 30-year sentence for the trafficking of one fifteen-year-old victim, including producing pornography involving the victim.

Considering health care fraud defendants, in *United States v. Feldman*, 647 F.3d 450 (2d Cir. 2011), the Second Circuit affirmed a within guideline sentence of 188 months' imprisonment where, although no patients actually died, the defendant placed victims at risk of death by fraudulently soliciting individuals to purchase organ transplants.   In *United States v. Mateos*, 623 F.3d 1350 (11th Cir. 2010), the Eleventh Circuit affirmed an upward variance to 360 months' imprisonment for a doctor who committed Medicare fraud in connection with HIV-positive patients.   And, in *Ramirez, supra*, 491 F. App'x 65, the Eleventh Circuit affirmed a mid-guideline range sentence of 210 months' imprisonment where the defendant's health care fraud exposed his patients to the risk of serious injury, even though no patient was actually injured.

The remaining factors are neutral, and the combination of the factors above, on balance, suggest that a significant term of imprisonment is required to take into account the true nature of

the crime and this defendant.

Respectfully submitted,

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

By:   s/*A. Marie Villafaña*
_____
A. MARIE VILLAFAÑA
Assistant United States Attorney
Florida Bar No. 0018255
500 South Australian Avenue, Suite 400
West Palm Beach, FL 33401
Telephone: 561 820-8711
Facsimile: 561 820-8777
ann.marie.c.villafana@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 12, 2017, I electronically filed the foregoing document with the Clerk of the Court and served the document via CM/ECF.

s/ *A. Marie Villafaña*
_____
A. MARIE VILLAFAÑA
Assistant United States Attorney