**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 17-80013CR-MIDDLEBROOKS/BRANNON**

UNITED STATES OF AMERICA,
      Plaintiff,

v.

JOAQUIN MENDEZ,
      Defendant.
_____/

## DEFENDANT'S SENTENCING MEMORANDUM

The Defendant, Joaquin Mendez, by and through his undersigned counsel, respectfully submits this sentencing memorandum for this Honorable Court's consideration. Dr. Mendez requests this Court determine that a variance from the applicable guideline range is appropriate under 18 U.S.C. § 3553, and thus impose a sentence below the sentence advised by the United States Sentencing Guidelines.

## STATEMENT OF FACTS

*Procedural History*

1.     The government charged Dr. Mendez, a licensed medical doctor, by superseding information, with conspiracy to defraud the United States in violation of 18 U.S.C. §§ 1347 & 24(b). Doc. 66.

2.     Dr. Mendez's offense involved the following other co-defendants:

     a)     Michael Bonds, *see United States v. Michael Bonds*, Case No. 17-80013-CR-DMM (S.D. Fla Apr. 24, 2017 - date of imposition of sentence);

     b)     Fransesia Davis, *see United States v. Fransesia Davis*, Case No. 17-80013-CR-DMM (S.D. Fla. Apr. 24, 2017 - date of imposition of sentence);

c)      Stefan Gatt, *see United States v. Stefan Gatt*, Case No. 17-80013-CR-DMM (S.D. Fla. Apr. 24, 2017 - date of imposition of sentence);

d)      Barry Gregory, *see United States v. Barry Gregory*, Case No. 17-80033-CR-DMM (S.D. Fla. Apr. 26, 2017 - date of imposition of sentence);

e)      Laura Chatman, *see United States v. Laura Chatman*, Case No. 17-80013-CR-DMM (S.D. Fla. May 18, 2017 - date of imposition of sentence);

g)      Kenneth Chatman, *see United States v. Kenneth Chatman*, Case No. 17-80013-CR-DMM (S.D. Fla. May 18, 2017 - date of imposition of sentence);

h)      Donald Willems, *see United States v. Donald Willems*, Case No. 17-80013-CR-DMM (S.D. Fla. June 14, 2017 - date of imposition of sentence).

3.      On July 14, 2017, Dr. Mendez pled guilty to the single offense of health care conspiracy pursuant to a plea agreement. Doc. 269; 270.

4.      Dr. Mendez's sentencing is set for November 7, 2017. Doc. 315.

*Advisory Guideline Calculation*

5.      The Presentence Report (PSR) calculates Dr. Mendez's total offense level as a level 27 with a criminal history category of I. (PSR at ¶¶ 176; 179). In the absence of a mandatory minimum penalty, Dr. Mendez faces an advisory guideline sentencing range of 70 to 87 months of incarceration. *Id*. at ¶ 205.

6.      However, Dr. Mendez has raised objections to the two-level enhancements for conscious or reckless risk of death or serious bodily injury and vulnerable victim under USSG §§ 2B1.1(b)(15)(a) and 3A1.1(b)(1). If this Court were to sustain said objections, Dr. Mendez would be facing an advisory guideline range of 46 to 57 months of incarceration. As the following discussion demonstrates, even this advisory range violates principle of just sentencing articulated under 18 U.S.C. § 3553.

## MEMORANDUM OF LAW

This memorandum establishes that a variance is warranted in Dr. Mendez's case pursuant to 18 U.S.C. § 3553, notwithstanding the calculation of the sentence determined by the advisory guideline range. The application of section 3553's statutory framework is especially critical in the instant case since each of its sentencing factors supports Dr. Mendez's request for a variance. *See* 18 U.S.C. § 3553(a).

I.   ***Booker and its Progeny Provides the Court with the Discretion to Impose a Variance under 18 U.S.C. § 3553(a)***

Pursuant to *United States v. Booker,* 543 U.S. 220, 245-67 (2005), a court is now unencumbered in its ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007) (quoting *Koon v. United States,* 518 U.S. 81 (1996)).

To guide a court's discretion, section 3553(a)(2), requires sentencing courts to consider not only the advisory Guidelines range, but also the facts of a specific case through the lens of seven factors, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established;
> (5) any pertinent [Sentencing Commission] policy statement;
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

3

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)-(7). Against this backdrop of factors, Dr. Mendez respectfully submits that a variance is warranted in his case.

**1.     The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

The significance of the first § 3553 factor is found in its comprehension that a consideration of a defendant's criminal conduct cannot disregard the life he has led beyond his crime.  As noted in *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006)(Rakoff, J.), the importance of considering a defendant's entire history reaches its pinnacle at the time of sentencing.

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics' of the defendant.

*Id.* at 513–14.

*The History and Characteristics of the Defendant*

The tenet in *Adelson* that a defendant's criminal conduct must be measured against his overall life has particular resonance in the instant case. For the weighing of the good with the bad in Dr. Mendez's life reveals that his criminal conduct is antagonistic to the principles which have governed his existence. As such, an examination of Dr. Mendez's history and characteristics establishes that his criminal conduct constitutes an aberrant episode in an otherwise exemplary life. As demonstrated by the statements of support, such principles include hard work, dedication, kindness and compassion.

Dr. Mendez is a 53-year-old man with no criminal history who has been married to Faith Mendez for twenty-five years. PSR at ¶ 186. Dr. Mendez is also a committed father to his four children, including: his sons Jesus (age 29) and Jared (age 15), as well as his twin daughters, Olivia and Alexia (age 22). *Id.* at ¶¶ 186-187. Currently, all of Dr. Mendez's children reside with him in his four-bedroom house in Miramar, Florida. *Id.* at ¶ 189. Dr. Mendez's father, who is 85-years old, resides in Hialeah, Florida. Because of his father's age and deteriorating condition, Dr. Mendez is instrumental in his care and to his well-being. As Pelayo Mendez states,

> my brother cares for my elderly father by both making sure that he receives the best care and spending considerable time with him. Because of my brother's impending absence, I am afraid for my father's wellbeing because of his fragile health.

*See* Letter of Pelayo Mendez, attached hereto as Exhibit 1.

The written and videotaped statements of support establish that Dr. Mendez is an outstanding husband, parent, son and friend. *See* Video Taped Statements of Support, attached hereto as Exhibit 2. Faith Mendez writes that her husband has been a committed spouse and parent who always puts his family first. *See* Letter of Faith Mendez, attached hereto as Exhibit 3. She writes:

> I have been so blessed to have lived with man who has always been such a committed husband and parent. Throughout our 25-year marriage, Jack has always demonstrated that his family is his top priority. The love and commitment he shows us every single day has been a wonderful gift.

Ex. 3.

Consistent with Mrs. Mendez's statement, her daughter writes:

> Not only has my father been the best father to my siblings and I but he has also impacted our friends' lives as well.
>
> . . .

> By being supportive of us he has given us confidence to believe we can do whatever we want to do in life. He shaped me into the person I am today and I am proud of the person I have become.

Letter of Alexa Mendez, attached hereto as Exhibit 4. *See also* Ex. 1 (stating that Dr. Mendez

"has taken great care and interest in raising his children) Alexa Mendez's twin sister, Olivia,

states

> [a]lmost everything I am is because of my father and how he raised me. My values are honor, respect, humility, love and determination. Each one has been demonstrated by my father throughout my life and to this very day.

*See* Letter of Olivia Mendez, attached hereto as Exhibit 5.

Olivia Mendez's letter, as well as the other letters of support, reveals other critical aspects

of Dr. Mendez's character beyond his devotion to his family. Dr. Mendez's life has been

characterized by his love and compassion for others. Ebony Miller writes that "Dr. Mendez is

one of the most amazing men I know" and that "he is humble, considerate and dedicated to the

well-being of others." *See* Letter of Ebony Miller, attached hereto as Exhibit 6.  Ms. Miller, a

young, single mother, further describes the instrumental role that Dr. Mendez played in her and

her son's life. *Id*.; *see also* Letters of Phillip Li, Alice Li, Bilal Marshall, Christian Enriguez, and

Stephen Lostumbo, attached hereto as composite Exhibit 7.

The letters also establish that Dr, Mendez's medical career has been marked by his great

kindness toward and care for his co-workers and patients. As Janella Fuxa, a former business

partner writes:

> [over] the years I have seen countless acts of his kindness and dedication to his patients and staff. He has always given his patients the time they need, not the time his schedule allows. No uninsured patient was ever turned away, they would be seen and provided medical care as any other. He cared for his staff and treated them more like family than employees. His dedication to the welfare of his patients and staff was unwavering and admirable.

Letter of Janella Fuxa, attached hereto as Exhibit 8 *see also* Letter of Dayana Reyes, attached as Exhibit 9 (stating that Dr. Mendez shows great love and care for both his patients and employees and that Ms. Reyes has "never met a person with more dedication, professionalism and humanity . . ."); Employee Letters attached hereto as composite Exhibit 10.

Ms. Fuxa's letter indicates that money was not a driving force in Dr. Mendez's career. As Karen Singh affirms "[o]ne personality [of Dr. Mendez's] that struck me [was that] he was more of a non-profit provider than for profit . . . It was more important for him to treat rather than charge patients." *See* Letter of Karen Singh, attached hereto as Exhibit 11; *see also* Letter of Shemala Clark, attached hereto as Exhibit 12 (stating that during the fifteen years she has worked with Dr. Mendez, "[h]e has treated patients in the office without insurance or no monies to pay" and "[i]t is so comforting to work alongside a doctor that carries his profession not as a superior but as to heal others").

Dr. Mendez's patients provide vivid examples of the great humanity and generosity that he brought to his practice. Alvaro Pena describes how Dr. Mendez assisted in the care of his mother in Columbia and in the process saved her life. *See* Letter of Alvaro Pena, hereto attached as Exhibit 13. Elsa Delgado recounts how Dr. Mendez provided her with low-cost and outstanding care after she lost her job. *See* letter of Elsa Delgado, attached hereto as Exhibit 14. Donna Otero states that Dr. Mendez provided pro bono assistance to her grandson, who suffers from Down syndrome. Letter of Donna Otero, attached hereto as Exhibit 15. Natalio Wosk, who is elderly, captures the type of person and doctor that Dr. Mendez is in stating:

> I am an elderly patient with multiple chronic conditions who is alone in the state of Florida. I have suffered of a bit of depression due to the loneliness. [Dr. Mendez] gave me his personal cell phone number if ever I had a medical emergency I could call him directly. I can remember a few times I have felt really down and depressed, I contacted the doctor directly. He was amazing he came by my house, spent some time talking to me, giving me the company I needed. On a

> few occasions he has picked me up and taken me out to lunch with his father. He
> is truly an amazing individual with a heart of gold. I am so grateful to have found
> a doctor that is so compassionate and loving with his patients.

Letter of Natalio Wosk, attached hereto as Exhibit 16. As Dr. Mendez's patients establish, he is both a rare doctor and man whose medical career has been characterized by his great love and concern for all who has crossed his path.  *See* additional Patient Letters, attached hereto as composite Exhibit 17.

Notably, Dr. Mendez's noble characteristics has been recognized by his professional colleagues. Christina Carmona, a nurse who has worked with Dr. Mendez, describes him as "one of the most caring, honest, and professional Physicians I have ever worked with." Letter of Christina Carmona, ARNP, attached hereto as Exhibit 18. She maintains that Dr. Mendez has always emphasized patient care, regardless of payment. *Id.*  Dr. Diane Baker asserts that Dr. Mendez is "a highly skilled, caring, passionate, dedicated Physician" whose skills exemplify patient care and knowledge." Letter of Dr. Diane Baker, attached hereto as Exhibit 19. In depicting the great impact that Dr. Mendez had on her medical career, Dr. Margarita Almeida El-Ramey echoes this sentiment in describing him as a "compassionate, hardworking, caring physician that is loved by his patients and those who spend time around him."  *See* Letter of Dr. Margarita Almeida El-Ramey, attached as Exhibit 20.

Like Dr. Almeida El-Ramey, Dr. Megan Jansen also informs this Court about the positive impact that Dr. Mendez had on her career. *See* Letter of Dr. Megan Jansen, attached hereto as Exhibit 21. Like so many others, Dr. Jansen has observed Dr. Mendez's exemplary qualities and great dedication to his patients.

> I have never known Joaquin to be anything but kind, compassionate and honest. I
> have been fortunate enough to witness firsthand how much he cares for his

patients and how he will do everything in his power to help his patients get the proper treatment that they need.

*Id. See also* Letters of Dr. Marlene Tages-Cordova & Isis Barroso, attached as composite Exhibit 22.

As the forgoing letters establish, a consistent theme in Dr. Mendez's is his generosity, kindness, and his great compassion.[1] When the totality of Dr. Mendez's life and medical career is analyzed, it seems clear that his criminal behavior marked a dramatic deviation from the remarkable service he provided to his family, friends, and patients. Thus, if *Adelson's* admonition that a sentencing court should consider a defendant's overall existence in imposing his sentence then the undersigned respectfully submits that the totality of Dr. Mendez's overall life calls for a variance from the applicable guideline range.

In this regard, in addition to *Adelson*, other cases support the proposition that a defendant's history of charitable deeds and good works supports a variance.  *See*, *e.g*, *United States v. Tomko*, 562 F.3d 558, 569-71 (3d Cir. 2009) (en banc) (where defendant was convicted of tax evasion of $225,000 and faced a guidelines sentence of 12-18 months, district court's sentence to probation on condition of one year home detention was not unreasonable because of

---

[1] Regarding the significance of compassion to human existence, the Dalai Lama XIV has concluded:

> [w]e can reject everything else: religion, ideology, all received wisdom. But we cannot escape the necessity of love and compassion.... This, then, is my true religion, my simple faith. In this sense, there is no need for temple or church, for mosque or synagogue, no need for complicated philosophy, doctrine or dogma. Our own heart, our own mind, is the temple. The doctrine is compassion. Love for others and respect for their rights and dignity, no matter who or what they are: ultimately these are all we need. So long as we practice these in our daily lives, then no matter if we are learned or unlearned, whether we believe in Buddha or God, or follow some other religion or none at all, as long as we have compassion for others and conduct ourselves with restraint out of a sense of responsibility, there is no doubt we will be happy.

his "negligible criminal history, his employment record, his community ties, and his extensive charitable works"); *United States v. Thurston,* 544 F.3d 22, 26 (1st Cir. 2008) (where defendant was convicted of fraud in excess of five million dollars and guidelines capped at 60 months, district court's sentence of 3-months was affirmed based on defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others"); *see also United States v. Cooper*, 394 F.3d 172 (3rd Cir. 2005) (similar).

Because Dr. Mendez has lived such a rewarding and worthwhile life, it is difficult to reconcile his criminal actions that are so contradictory to the principles that have defined him. He cannot be easily portrayed or merely dismissed as man motivated by avarice or characterized by an indifference to others. What emerges from the statements of support is that Dr. Mendez's crime was truly an aberrant chapter in an otherwise remarkable existence.

*The Nature and Circumstances of the Offense*

Having considered Dr. Mendez's exemplary life, the essential question is how a man, who has accomplished so much and has done such good could have committed his crimes. The unanswered question of how a dedicated doctor, husband, father and son**,** with no criminal history, becomes a convicted criminal seems beyond comprehension. To understand the cause of Dr. Mendez's criminal conduct requires an analysis of both the nature of his conduct and the context in which his actions occurred. Such an analysis provides a compelling explanation for his conduct since it ultimately reveals a unique study in the human failings that mitigates a defendant's crime and punishment. In this regard, despite Dr. Mendez's criminal responsibility for a fraud conspiracy, there are certain mitigating factors concerning his conduct.

*Nature and Extent of Dr. Mendez's Actions*

There is no dispute that the scheme germinated in the depraved heart of Dr. Mendez's co-defendant, Kenneth Chatman, who utilized the services of others to defraud health care benefit programs. Chatman devised a scheme through his ownership and operation of two treatment facilities (Journey and Reflections), as well as multiple sober homes from August 2012 through December 2016. Chatman also paid kickbacks to other sober homes and labs as part of his scheme. As the architect of the scheme, Chatman directed the admission, testing, treatment and discharge of the patients and defrauded the benefit programs of approximately $16,247.551. See PSR at ¶¶ 53-68; Doc. 312.

Dr. Mendez fully accepts, however, that during his involvement with Chatman he violated his duties as a physician and engaged in criminal conduct as detailed in the PSR. Nevertheless, Dr. Mendez submits there are mitigating factors concerning his offense conduct.

Although Chatman's scheme lasted approximately four years, Dr. Mendez involvement in the enterprise was limited to a single year from September 2014 through September 2015. At the time that he began working for Chatman, Dr. Mendez believed he was entering into a legitimate business relationship. He was not aware of Chatman's criminal past, nor his use of kickbacks and bribes. Dr. Mendez was certainly not aware of Chatman's sexual abuse of the patients.

As the medical director of Reflections, Dr. Mendez did not supervise or have responsibility over the clinical side of the program. *See* Doc. at Doc. 271 at ¶ 1. As a consequence, Dr. Mendez did not design clinical or other treatment plans. Such plans were not within his purview and were already in place when Dr. Mendez began his work at Reflections in 2014.

At the time he started at Reflections, Dr. Mendez discovered its existing and improper use of thrice-weekly saliva testing which was duplicative of urine testing. Consistent with his initial intent to practice legitimately, Dr. Mendez informed the clinical director and others that thrice-weekly saliva testing was unnecessary. Dr. Mendez also refused to authorize standing orders for DNA and allergy testing as demanded by Chatman.

Dr. Mendez's approach to the saliva, allergy and DNA testing differed from the other medical directors at Reflections, such as Donald Willems. *See* PSR at ¶¶ 93, 101-102. Although Dr. Mendez did execute certain standing orders for other testing when he started at Reflections, the use of such standard orders was initially an acceptable course of practice within the substance abuse treatment field. At the time Dr. Mendez started at Reflections, the industry-standard was to sign a standing order before you saw the patient. Said industry standard began to change sometime in 2015 as such standing orders, after the initial test, became patient specific.

Even though Dr. Mendez accepts that he is responsible for a loss amount of $1.5 million to $3.5 million, this amount if far less than the loss caused by his-co-defendant Donald Willems. Willems. After Willems replaced Dr. Mendez as the medical director at Reflections and worked there from October 2015 through May 2016. During this time, Willems caused a loss of approximately $6.5 million dollars. PSR at ¶ 107; *see also* Willems Plea Agreement at Doc. 148, ¶ 7 (stating that Willems is responsible for a loss amount of $3.5 to $9.5 million). Furthermore, it also important to consider that Dr. Mendez received only a small fraction of his $1.5 to $3.5 million in loss. Indeed, he earned a monthly salary of $2500 at Reflections.

A critical aspect of Dr. Mendez's case is predicated on his decision to leave Reflections in September 2015. On September 9, 2015, Dr. Mendez's ended his relationship with Reflections when he discovered that it was submitting billing under his name for allergy and DNA testing, in

contradiction of his directive.  Dr. Mendez's actions provide a marked contrast to the conduct of his co-defendant Donald Willems. As opposed to Dr. Mendez, Willems signed standing orders for allergy and blood. Willems also authorized saliva testing three times a week which Dr. Mendez had refused to authorize. As a result, the cost of laboratory testing skyrocketed and a substantial portion of the loss to the insurance companies occurred while Willems was medical director.

While Dr. Mendez's relatively small gain, as well as his decision to leave Reflections does not absolve him, it does ultimately demonstrate that his actions were not necessarily the product of greed and callousness. Rather, as the following discussion demonstrates, an explanation for Dr. Mendez's aberrant criminal actions is found in the context in which he committed his crime.

### The context in which Dr. Mendez committed his crime

Dr. Mendez accepts that he violated his duty as a doctor and contributed to Chatman's scheme to defraud. Nevertheless, the question remains how an individual who worked so hard to become a doctor and displayed such compassion as a physician could engage in conduct that has destroyed his legacy and career.

Although Dr. Mendez's decision to abdicate his duty is unfathomable, an analysis of his circumstances at the time he committed his crime provides a compelling explanation. As portrayed in the statements of support, Dr. Mendez's life has been characterized by his great commitment to his family and loved ones. At the time he started his employment at Reflections, Dr. Mendez was attempting to cope with the terminal illnesses of his mother (pancreatic cancer), sister-in-law Jill Moon (ovarian cancer) and close friend Richard Cousins (lymphoma). *See Letter* of Faith Mendez at Ex.3.

During this time, Dr. Mendez's wife traveled extensively to Pennsylvania to care for her sister during her chemotherapy treatments. *Id*. As a result, Dr. Mendez assumed the primary caretaking responsibilities for his children as well as the care of his mother and friend. Thus, Dr. Mendez would spend every day driving back and forth between Miramar, Palm Beach and Hialeah to care for his regular patients, his mother, friend, and his clients in hospice. *Id*. He also had to maintain his primary care practice and his work with nursing homes. Because of the stress that Dr. Mendez experienced during the year he worked at Reflections, he began drinking to excess as a coping mechanism. *See* PSR at ¶ 194. The turmoil that characterized Dr. Mendez's life did not lessen until his sister-in-law and friend passed on the same day in July 2015 and his mother died in August of that same year.

While these circumstances do not excuse his criminal conduct, they do mitigate Dr. Mendez's blameworthiness. Indeed, the comprehension of the turmoil and stress that Dr. Mendez experienced during his employment at Reflections support the tenet that his decision-making was impaired, rather than being the product of a depraved heart. Ultimately, the toxic combination of Chatman's siren song and the taxing circumstances of Dr. Mendez's life led him into a dark wood where his path was lost.[2] A revealing aspect of Dr. Mendez's year-long participation in Chatman's scheme is that he was finally able to end the relationship after the passing of his loved ones, when he once again had the full capacity to make rationale and unencumbered decisions.

Although Dr. Mendez's blameworthiness can of course be considered according to the nature and seriousness of the harm caused or threatened by the crime, it can also be assessed according to "the offender's degree of culpability in committing the crime, in particular, his

---

[2] *See* Dante Aligheni, La Divina Commedia, Inferno, Canto I, (1472) (Midway through this Life we are borne upon; I found myself in a dark wood, Where the way of truth was wholly lost and gone).

degree of intent (mens rea), motives, role in the offense, and mental illness or diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (Feb. 2005).

Despite the foregoing mitigation concerning Dr. Mendez's conduct, he fully accepts that he is responsible for his crime. As the statements of support indicate, he is also deeply remorseful for his conduct. *See, e.g.,* Letter of Faith Mendez at Ex. 3. Dr. Mendez's remorse is a natural reaction to engaging in conduct that departed so dramatically from his admirable history as a physician. Consistent with his remorse and contrition, Dr. Mendez has provided ongoing and substantial cooperation to the Government regarding his actions and the criminal conduct of other individuals. Through the course of two extensive proffers, Dr. Mendez provided substantial and significant information regarding medical providers, clinics, labs, marketers, and other professionals who were engaged in fraud. Once again, Dr. Mendez's remorse and efforts to make amends for his conduct casts him in a far different light than his co-defendant Donald Willems, who continued his criminal activity after his arrest and received an enhancement for obstruction of justice.[3] *See* Doc. 132.[4]

---

[3] "To err is human, but contrition felt for the crime distinguishes the virtous from the wicked." Vittorio Alfieri, *Rosmunda*, Act III, I (1780).

[4] As described in the Court's Revocation Order (Doc. 132), Donald Willems violated his bond conditions in three material aspects.  *See* Doc. 132 at 2-3.

> First, he knowingly had contact with witnesses in this case who he continued to work with at Deerfield Medical Center while he was on pretrial release. Second, Defendant continued to provide services to patients who were residing at sober homes or receiving treatment at substance abuse treatment centers as evidenced by Defendant's own patient treatment notes and as evidenced by interviews of patients. Third, Defendant violated federal law, 21 U.S.C. § 841(a)(1), while on bond when he prescribed controlled substances to patients and to himself using the DEA and/or DEAX numbers of other physicians without their knowledge.

Doc. 132 at 2-3.

Notwithstanding the government's failure to file a motion under USSG §5K1.1, Dr. Mendez respectfully submits that this Court should consider his substantial assistance to the government in support of a variance under § 3553(a). *See United States v. Blue*, 557 F.3d 682, 686 (6th Cir. 2009)(stating that post-*Booker*, "the government's failure to file a Section 5K1.1 departure does not necessarily preclude a sentencing court from taking into account substantial assistance when considering the appropriate sentence in light of the Section 3553(a) factors."); *United States v. Doe*, 213 Fed.Appx. 660, 663 (10th Cir. Jan. 12, 2007)(unpub)(holding that district court should address cooperation as part of its §3553(a) analysis even in absence of a 5K1.1 motion when raised by the defendant); *United States v. Ochoa-Ramos*, 2008 WL 2062341, at *3 (E.D.Wis. 2008)(noting the ability to consider cooperation with the government as evidence of defendant's character under §3553(a) beyond a reduction under §3E1.1, even in the absence of a §5K motion from the prosecution). *See also Jaber*, 362 F. Supp. 2d 381. In the end, Dr. Mendez's efforts to assist the government supports a variance since his actions demonstrate his acceptance of responsibility for his criminal conduct and his substantial attempt to remedy the impact of his actions.

2.      **The Need for the Sentence Imposed**

  A.      *To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

As a preliminary matter, as discussed in Section D below, Dr. Mendez's age means that incarceration will constitute a uniquely harsh form of punishment for him.

Notwithstanding the harshness of his incarceration, this Court should also consider the significant punishment of the collateral consequences of Dr. Mendez's felony conviction. Based on his conviction, Dr. Mendez will lose his medical license and his ability to practice as a physician. Such a consequence is an especially harsh result for Dr. Mendez as it necessarily

destroys his legacy as a dedicated doctor who made a difference in the lives of others. The statements of support demonstrate that Dr. Mendez pursued his lifelong dream of becoming a doctor through hard work and perseverance.  An examination of his life as a physician establishes his concern and care for others, regardless of their station in life.

Although significant, the loss of Dr. Mendez's medical license is just one of the overwhelming number of collateral consequences that he will face as result of his felony conviction. A recent congressional report authored by the United States Government Accountability Office (GAO) demonstrates that there are 641 collateral consequences of a nonviolent felony conviction. *See* GAO Report 17-691, NONVIOLENT DRUG CONVICTIONS, *Stakeholders Views on Potential, Actions to Address Collateral Consequences*, (Sept. 2017), available at http://www.gao.gov/products/GAO-17-691.pdf, summary excerpt attached hereto as Exhibit 23. Of these 641 collateral consequences, 497 (78%) of them may last a lifetime.[5] *See id*.

Recognizing the vast number of collateral consequences attached to a federal felony conviction, one district court has emphasized the need for federal judges to account for such an impact at sentencing   *United States v. Nesbeth*, Case No. 1:15-cr-00018, 2016 WL 3022073, at *1 (E.D.N.Y May 24, 2016)(Block, J.)(varying downward from guideline range of 33 to 44 months imprisonment to one-year of probation for a drug defendant based in part on the number of statutory and regulatory consequences he faced as a convicted felon). *Nesbeth* concluded that "sufficient attention has not been paid at sentencing . . . to the collateral consequences facing a

---

[5] The unrelenting march to Dr. Mendez's diminution, if not destruction, has already begun. *See* PSR at p. 42-43. Indeed, the PSR recommends special conditions of supervision that include: 1) the prohibition of Dr. Mendez's participation in any health care concern; 2) the permanent relinquishment of his medical license; and 3) his acquiesence to any searches of his place or person. *See id*. at p. 43. The societal shaming accomplished through these means removes the necessity of the public stockade.

convicted defendant. And I believe that judges should consider such consequences in rendering a lawful sentence." *Id*.; *see also* Jeremy Travis, *Invisible Punishment: An Instrument of Social Exclusion, in Invisible Punishment: The Collateral Consequences of Mass Imprisonment* (Marc Mauer & Meda Chesney-Lind eds., 2002).

In granting a variance in *Nesbeth*, the court asserted that the collateral effects of a criminal conviction can be "devastating" to a defendant. *Nesbeth*, 2016 WL 3022073, at *1.

> Myriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that 'they' are no longer part of 'us.'

*Id*. (citing Michelle Alexander, *The New Jim Crow* (2010)). As Judge Block concluded, "[t]oday, the collateral consequences of criminal convictions form a new civil death." *Id*. at *3.  This new civil death for a convicted felon significantly impacts their rights and future prospects.

> Today a criminal freed from prison has scarcely more rights, and arguably less respect, than a freed slave or a black person living "free" in Mississippi at the height of Jim Crow. Those released from prison on parole can be stopped and searched by the police for any reason ... and returned to prison for the most minor of infractions, such as failing to attend a meeting with a parole officer... The "whites only" signs may be gone, but new signs have gone up —notices placed in job applications, rental agreements, loan applications, forms for welfare benefits, school applications, and petitions for licenses, informing the general public that "felons" are not wanted here. A criminal record today authorizes precisely the forms of discrimination we supposedly left behind— discrimination in employment, housing, education, public benefits, and jury service. Those labeled criminals can even be denied the right to vote.

*Id*. (citing *The New Jim Crow* at 141). As *Nesbeth* establishes, the civil death that Dr. Mendez now faces as a result of his conviction constitutes significant punishment.

From the videotaped statements and the letters of support, it is apparent that that Dr. Mendez has become a broken man haunted by remorse due to instant case. While Dr. Mendez's miserable state results from his own actions, a consideration of his condition is also important in

terms of the punishment he has received for his crime. Indeed, after working diligently to realize his childhood dream of becoming a doctor, Dr. Mendez will never work in the medical field again. Furthermore, after living an exemplary and altruistic life for 53 years, Dr. Mendez's legacy is now his status as convicted felon -- a dishonor that will impact all aspects of his life.

  B.      *To afford adequate deterrence to criminal conduct*

The principle of general deterrence is based on the unsupported premise that lengthy prison sentences deter crime. This faulty conception has resulted in the mass incarceration of individuals in the United States.

> For the past 40 years, the United States has been engaged in a vast, costly social experiment. It has incarcerated a higher percentage of its people, and for a longer period, than any other democracy. In fact, with 5 percent of the world's population, the U.S. is home to 25 percent of its prisoners. There are five times as many people incarcerated today than there were in 1970. . . [The] archipelago of prisons and jails costs more than $80 billion annually — about equivalent to the budget of the federal Department of Education.

Dr. Oliver Roeder et al., *What Caused the Crime Decline?*, Brennan Center for Just., 22-23 (Feb. 12, 2015), *available at* https://www.brennancenter. org/publication/what-caused-crime-decline.

The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"?*, 59 Crime & Delinquency 1006, 1031-33 (2013).  Kleck and Barnes' study concludes:

> there is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent.

*Id.* at 1031. The United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence.  *See* U.S. Dept. of Justice, Nat'l

Inst. of Justice, *Five Things About Deterrence* (July 2014), attached hereto as Exhibit 24. In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter punishment. *See id*.; *see also* Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963)("No punishment has ever possessed enough power of deterrence to prevent the commission of crimes").

       C.      *To protect the public from further crimes of the defendant*

Having established that prison sentences, regardless of length, has no impact on general deterrence, this section demonstrates that the § 3553(a) factor of specific deterrence also supports Dr. Mendez's request for a variance. The first part of this section focuses on studies establishing that incarceration has no effect on recidivism. In addition to this general empirical evidence, the second part asserts that Dr. Mendez's history and characteristics demonstrate that he will never be commit another crime.

       1.      *The relationship between incarceration and recidivism*

As in the case of general deterrence, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections*, Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016), hereto attached as Exhibit 25. As the following discussion establishes, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

A 2016 study conducted by the National Institute of Corrections (NIC) establishes three critical tenets regarding incarceration and specific deterrence. First, incarceration has a negligible impact on crime prevention. *See* Ex. 25 at 4; *see also* Vera Instit. of Justice, *Overview of The*

*Prison   Paradox:   More   Incarceration   Will   Not   Make   Us   Safer* (July 2017)(concluding that research shows a "weak relationship between incarceration and crime reduction, and highlights proven strategies for improving public safety that are more effective and less expensive than incarceration").[6] Instead, a longer prison sentence may actually lead to a greater risk of recidivism. *See id*. There is strong evidence that prison - by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to older more serious offenders - leads to increased recidivism. *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007).

Moreover, harsh penalties do not improve the long-term outcomes of the offender.  Ex. 24 at 4.  Longstanding research has found that imprisonment brings about negative individual-level changes that can harm re-integration upon release. National Research Council. *The Growth of Incarceration in the United States: Exploring Causes and Consequences,* (Nat'l Acad. Press 2014), available at. https://doi.org/10.17226/1861; *see also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887).("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance").

Finally, the 2016 study concludes that community correction programs are more effective than incarceration in reducing recidivism. Ex. 25 at 5. *See also* R. S. Frase et al, *Criminal History Enhancements Sourcebook* (2015)( discussing studies establishing the crime that

---

[6] The United States Sentencing Commission has determined that "[t]here is no correlation between recidivism and guidelines' offense level. . .  While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (May 2004).

"custody is associated with higher rates of re-offending than community sentences.")
Thus, the most effective to promote public safety and ensure that convicted persons can lead law-abiding lives is through broad use of non-incarceration sentences, especially since "incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections. Ex. 25 at 1, 4.

This last tenet is especially critical in Dr. Mendez's case. Indeed, a review of Dr. Mendez's history and characteristics demonstrates that he has been a valuable member of his family and community. As the memorandum demonstrates, he has made a real and tangible difference in the lives of so many others. Thus, allowing him a chance to remain in society will provide a very real benefit to the community.

> 2.   *Dr. Mendez's low risk of recidivism*

Based on Dr. Mendez's exemplary history and outstanding personal characteristics, it seems apparent that his criminal acts represent a solitary and rare occurrence in an otherwise outstanding life. What emerges from Dr. Mendez's long life is that it has been an existence characterized a consistent commitment to others. But the conclusion that Dr. Mendez poses an exceptionally low risk of recidivism is not merely based on mere intuition.[7] Indeed, empirical evidence establishes that Dr. Mendez's specific history and characteristics obviates the § 3553 factor of specific deterrence.

Dr. Mendez is 53 years old, has significant education, and only situational evidence that he relied on alcohol secondary to his recent troubles, has been married for over 25 years, and has been employed throughout his adult life. Because of his age, family support, lack of criminal

---

[7] This is not to say that the human attribute of intuition should be disregarded. As the neuro-psychologist Malcolm Gladwell has found, intuition or instinct is a significant adaptive mechanism which often results in the most valid and effective decisions. *See* Malcolm Gladwell, *Blink* (Little, Brown & Co. 2005).

history, marital status, education, and employment history, Dr. Mendez poses an extremely low risk of recidivism. *See* USSC *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12-13 (May 2004).

Furthermore, Dr. Mendez is in a Criminal History Category of I. For all male offenders in Criminal History Category I, the recidivism rate is 15.2%. *See Measuring Recidivism* at 28. For those over age 50, however, the rate for Category I offenders drops to 6.2%. *See id*. Furthermore, with the loss of his medical license, Dr. Mendez no longer poses a risk to engage again in health care fraud.

The United States Sentencing Commission has recognized the advisability of revising the guidelines to take age and first offender status into account. *Measuring Recidivism* at 16 (noting that "[o]ffender age is a pertinent characteristic" that would "improve [the] predictive power of the guidelines "if incorporated into the criminal history computation"). The Commission has not implemented any such revisions to the criminal history guidelines, but has recently stated that age "may be relevant" in granting a departure. USSG § 5H1.1, *see Measuring Recidivism* at 16

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Dr. Mendez, this Court should consider the statistically low risk of recidivism presented by him. *See, e.g.*, *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime); *United States v. Urbina*, slip op., 2009 WL 565485, *2-3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *Simon v.*

*United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum*, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age and noting that likelihood of recidivism was "very low").

The fact that Dr. Mendez is in a Criminal History Category of I at the age of 53-years-old further supports his request for a variance. *See* 28 U.S.C. § 994(j) (Congress stressed "the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."); *United States v. Ward,* 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense); *see also United States v. Paul*, 561 F.3d 970, 973 (9th Cir. 2009) (where defendant convicted of embezzlement and faced a guidelines sentence of 10-16 months, sentence of 15 months was unreasonably high in part because defendant was a first-time offender with no criminal record whatsoever); *United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) (district court's *sua sponte* variance to probation not unreasonable in part because guidelines "did not fully account for [the defendant's] complete lack of criminal history"); *see also United States v. Huckins,* 529 F.3d 1312, 1319 (10th Cir. 2008).

Furthermore, Dr. Mendez's praiseworthy life further establishes that he is not likely to engage in criminal conduct in the future. Finally, Dr. Mendez's loss of reputation further underscores the tenet that he poses a low risk of recidivism. *See Adelson* 441 F.Supp.2d at 514 (stating that "[w]ith [the defendant's] reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct.").

In the absence of a deterrent effect, Dr. Mendez submits that a variance is warranted in his case.

> D.    *To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.*

A significant sentencing consideration is the need to provide Dr. Mendez with training or care in the most effective manner. *See* § 3553(a)(2)(D).

Based on his education and employment history, Dr. Mendez would not benefit from any educational or vocational programs in the Federal Bureau of Prisons (BOP). He would, however, benefit from substance abuse counseling. *See* PSR at ¶ 193.

Dr. Mendez's age, however, poses recognized challenges for the BOP. U.S. Dep't of Justice Office of Inspector General, *The Impact of an Aging Prisoner Population on the Bureau of Prisons*, Executive Summary (May 2015).[8] Indeed, the Government, itself, has concluded that "BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population and provide limited training for this purpose." *Id.* at ii. The Government also concluded:

> We further found that limited institution staff and inadequate staff training affect the BOP's ability to address the needs of aging inmates. The physical infrastructure of BOP institutions also limits the availability of appropriate housing for aging inmates. Further, the BOP does not provide programming opportunities designed specifically to meet the needs of aging inmates. We also determined that aging inmates engage in fewer misconduct incidents while incarcerated and have a lower rate of re-arrest once released.

*Id.* at i.

Against the backdrop of the BOP's failure to adequately provide care for Dr. Mendez's based on his age, this Court should consider the governmental concern with the containment of

---

[8] The executive summary defines "aging" as individuals over the age of fifty. U.S. Dep't of Justice Office of Inspector General, *The Impact of an Aging Prisoner Population on the Bureau of Prisons*, Executive Summary, at i, n.2 (May 2015).

costs. In the 2013 fiscal year, the cost of housing inmates over the age of 50 was approximately $881 million or 19% of the BOP's total budget. *See* Executive Summary at ii.

Notably, the guidelines recognize that Dr. Mendez's age may be a relevant factor for this Court in imposing his sentence. *See* USSG §§ 5H1.1 (age). Sections 5H1.1 specifically direct a court to consider a departure in cases where home confinement may be equally efficient and less costly than imprisonment. *See id*.

As the foregoing demonstrates, Dr. Mendez is unlikely to receive adequate care for based on his age. Accordingly, a downward variance is warranted based on the need to provide Dr. Mendez with correctional treatment in the most effective manner.

### 3. The Kinds of Sentences Available

A mandatory minimum sentence does not apply in Dr. Mendez's case.  Thus, a sentence below the advisory guideline range is permissible.

### 4. The Kinds of Sentences and the Guideline Sentencing Range Established

Although the impact of the guidelines on a court's sentencing discretion has been discussed in Section I, *supra*, the critical question in Dr. Mendez's case is the exact weight this Court should give to the guidelines. As recognized in *Gall*, district courts "may not presume that the Guidelines range is reasonable." 552 U.S. at 49, 128 S. Ct. at 597. Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all but the most unusual cases are now potentially relevant in every case.

The guidelines pose a particular risk in Dr. Mendez's case for a more elemental reason – they falsely provide a promise of predictability and fairness. Regarding the false promise of the guidelines, one district court aptly noted:

> Criminal behavior can fuel public outcry and drive broad legislative and executive agendas to get "tough on crime." But how does that translate to specific

26

instances? If you take a matrix to factor offense severity, overlay it with mandates born of popular outrage, and tailor it purportedly to address almost every eventuality, you get "justice" dictated in advance, marked by visceral condemnation, and based on the pretense of omniscience.

*United States v. Williams*, 372 F.Supp.2d 1335, 1337-1338 (M.D. Fla. 2005)(Presnell, J.).[9]

Because we believe the guidelines to be the product of great deliberation and reasoned judgment, we often assume that they provide clear direction for the proper sentencing of every criminal defendant, notwithstanding their backgrounds and the particular circumstances of their case.[10] Thus, we depend on the guidelines to relieve us of the burden and uncertainty of having to decide a just sentence for the particular defendant.[11] In effect, the guidelines, with their promise of mathematical certainty, provide a court with a sheltering sky against the purported abyss of ambiguity.[12] But such security is a false god and every time we make a sacrifice to it we are lost.[13] Indeed, the guideline ranges have often and dramatically failed our system of justice in creating results that are fundamentally unjust. For instance, for years, the guidelines for crack cocaine created a situation where defendants were harshly and unfairly sentenced.

Such is the case with the fraud guidelines since they are not the product of careful study

---

[9] Although *Williams* was reversed by the Eleventh Circuit in *United States v. Williams*, 456 F.3d 1353 (11th Cir. 2006), the Eleventh Circuit's decision was overruled by the United States Supreme Court. *See Kimbrough v. United States*, 552 U.S. 1353 (2010).

[10] Of course, the guidelines do address the background of each defendant and the circumstances of each case in a limited fashion through criminal history and offense conduct.

[11] At its core, the rigid matrix of the sentencing guidelines demonstrates the deeply-rooted human aversion to uncertainty and ambiguity. *See*, *e.g*, Maria Konnikova, *Why We Need Answers*, The New Yorker (Apr. 30, 2013). As Konnika asserts, studies demonstrate that the need to respond to uncertainty or a lack of clarity is present in the early stages of human development. *Id*. Because of our distress with the unknown and uncertain, we seek to achieve "cognitive closure" defined as the "desire for a firm answer to a question and an aversion to ambiguity." *Id*. (citing Dr. Arie Kruglanski, *Motivated Closing of the Mind*, Psych. Rev., at 263-83 (Apr. 1996)).

[12] *See* Paul Bowles, *The Sheltering Sky* (Random House 1949)("The sky hides the night behind it and shelters the people beneath from the horror that lies above.")

[13] *See* Bowles, *Sheltering Sky,* ("Security is a false God. Begin to make sacrifices to it and you are lost.").

based on empirical evidence. Consequently, the fraud guidelines do not reflect an approximation of sentences that might achieve § 3553 objectives. In *Rita,* 551 U.S. at 338, the Supreme Court gave two reasons that it may be "fair to assume" that the guidelines "reflect a rough approximation" of sentences that might achieve § 3553(a)'s objectives.   First, the original Sentencing Commission used an "empirical approach," which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past."  *Id.* Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Id*. at 348-50. The Court recognized, however, that not all guidelines were developed in this manner. *See Gall,* 552 U.S. at 46 & n.2; *Kimbrough v. United States*, 552 U.S. 85, 96 (2007).

When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 552 U.S. at 109-10.

### *An Advisory Sentencing Range Pursuant to Section 2B.1 Is Not Based on Empirical Data or National Experience*

Dr. Mendez's sentence for fraud should not be determined by a mechanistic application of USSG § 2B1.1. Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2B1.1, it failed to fulfill its institutional role. Thus, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Pepper v. United States*, 552 U.S. 1089 (2011); *Spears v. United States*, 129 S. Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

Prior to the guidelines, first-time offenders convicted of sophisticated fraud involving the highest loss amounts were sentenced to prison for 18-24 months on average. *See* U.S. Sent'g Comm'n, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* 33 (1987).  When the Commission adopted the original guidelines in 1987, it "decided to abandon the touchstone of prior past practice" with respect to white collar offenses. Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 22-23 (1988). Accordingly, the Commission promulgated a fraud guideline that required no more than 30-37 months for defendants in Criminal History Category I. *See* USSG § 2F1.1 (1987). Such a range was based on the Commission's conclusion that fraud offenses required short but definite sentences in order to have a deterrent effect. The Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." USSG, ch. 1, intro., pt. 4(d) (1987).

The Commission quickly abandoned its original goal of ensuring "short but definite" sentences. Beginning just two years after the Guidelines went into effect, prison sentences for fraud offenders were steadily increased. The effect of those increases on this case was to add four levels for loss in 1989, to add five more levels for loss in 2001, and to increase the base offense level by one level in 2003. Consequently, Dr. Mendez's advisory guideline range is now significantly higher than under the original 1987 guideline.

### An Advisory Sentencing Range Pursuant to Section 2B.1 is Inconsistent with§ 3553(a).

The Commission's deterrence rationale for dramatically increasing the guideline range was without justification. As noted previously, the empirical research regarding white collar offenders shows no difference between the deterrent effect of probation and that of

imprisonment. *See* Weisburd, *supra*; Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007). ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

Because of these essential problems with § 2B1.1, sentences in fraud cases reflect widespread judicial disagreement with the guidelines. For example, in fiscal year 2014, sentences below the guideline range were imposed in 52.6 % of all fraud cases. *See* U.S. Sent'g Comm'n, *2014 Sourcebook of Federal Sentencing Statistics*, tbl.27, hereto attached as Exhibit 26. "[S]ince *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines for cases like these and the fundamental requirement of Section 3553(a) that judges imposes sentences 'sufficient, but not greater than necessary' to comply with its objectives." Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039, at \*4 (Feb. 2008).

Finally, the problem that the guidelines pose in Dr. Mendez's case is that they, with their unwarranted facade of certainty, cannot account for the unique factors of his case which support his requested variance. As one Eleventh Circuit jurist once concluded, there is often a conflict between the guidelines and the requirements of § 3553(a). *See United States v. Glover*, 431 F.3d 744, 752-53 (11th Cir. 2005)(Tjoflat, J.), *abrogation on other grounds*, *United States v. Joseph*, 371 Fed.Appx. 70 (11th Cir. 2010)(unpublished). Thus, the Guidelines may have little persuasive force in light of some of the other § 3553(a) factors:

> Although judges must still *consider* the sentencing range contained in the Guidelines, . . . that range is now nothing more than a suggestion that may or may

not be persuasive . . . when weighed against the numerous other considerations
listed in [§ 3553(a) ].   Indeed, as one district judge has already observed, the
remedial majority in Booker [] direct[s] courts to consider all of the § 3553(a)
factors, many of which the guidelines either reject or ignore. For example, under §
3553(a)(1) a sentencing court must consider the history and characteristics of the
defendant.   But under the guidelines, courts are generally forbidden to consider
the defendant's age, his education and vocational skills, his mental and emotional
condition, his physical condition including drug or alcohol dependence, his
employment record, his family ties and responsibilities, his socio-economic status,
his civic and military contributions, and his lack of guidance as a youth.   The
guidelines' prohibition of considering these factors cannot be squared with the §
3553(a)(1) requirement that the court evaluate the history and characteristics of
the defendant.

*Id.* (quoting United *States v. Ranum*, 353 F. Supp. 2d 984, 986 (E.D. Wis. 2005)(internal

citations and quotations omitted)(emphasis in original)).

Certainly, Dr. Mendez's advisory guideline range in the instant matter cannot account

for: 1) his outstanding work history; 2) his societal contributions; 3) his commitment to and

compassion for his family and others; 4) the circumstances that led the commission of his crime;

5) the significant collateral consequences of his conviction; 5) his lack of criminal and his age;

and 6) his extremely low risk of recidivism. These factors, regardless of the advisory guideline

range, support Dr. Mendez's request for a variance.   Indeed, "this is one of those cases where

calculations under the Sentencing Guidelines lead to a result so patently unreasonable as to

require the Court to place greater emphasis on other sentencing factors to derive a sentence that

comports with federal law." *Adelson*, 441 F.Supp.2d at 506.

**5.      Any Pertinent Sentencing Commission Policy Statements**

Dr. Mendez is 53-years-old, as previously noted, the United States Sentencing

Commission has recognized the advisability of revising the guidelines to take age and first

offender status into account. *Measuring Recidivism* at 16 (noting that "[o]ffender age is a

pertinent characteristic" that would "improve [the] predictive power of the guidelines "if

incorporated into the criminal history computation").

6.    **The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.**

Regarding the goal of avoiding disparity in the sentences of defendants, Dr. Mendez submits that this factor strongly supports his request for variance. As previously noted, on the national level, in fiscal year 2014, sentences below the guideline range were imposed in 52.6 % of all fraud cases. The percentage of below-guideline sentences in just health care fraud cases in 2014 is even more substantial as it approaches 61%, *See Chart of Below Guideline Range Sentences in Health Care Fraud Cases*, attached hereto as Exhibit 27. Notably, since the 2006 fiscal year, the percentage of sentences imposed below the guidelines has increased from 36.2 % to the 61% figure. *See id.* Such an increasing and substantial number of departures in fraud sentences reflects widespread judicial recognition that the advisory guideline range under § 2B1.1 often does not promote the goal of just sentencing. To further illustrate this judicial recognition, Exhibit 28 provides charts of fraud cases both nationally and in the Eleventh Circuit, many of which involved losses far greater than the alleged loss in this case.

In *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008), Judge Block took a similar collection of cases into account in imposing an appropriate sentence for two securities fraud offenders. In response to the court's request, the parties submitted cases to illustrate the sentences imposed in other securities fraud cases. *Id.* at 752. Based on these samples, the court concluded that "[t]hose [defendants] who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); [while] those whose losses were less than $100 million were generally sentenced to single-digit terms." *Id.* at 753. The court relied on this national pattern in arriving at a sentence of 60 months for the two defendants who faced an advisory guideline range of 360 months to life, which was 16.7% of the

bottom of the applicable guideline range. *Id.* at 745.

In cases where defendants have received a §5K1.1 departure, the sentences imposed have reflected dramatic reductions under the advisory guideline range. *See*, *e.g.*, *United States v. Ayala*, Case No. 8:16-cr-264-T-33TGW (M.D. Fla. 2016)(imposing sentence of six months of incarceration on doctor convicted of health care fraud with loss amount of $2,322,078); *United States v. Sean Ragland*, Case No. 1:11-cr-162-LMB (E.D. Va. June 21, 2011) (imposing sentence of 90 days jail to be followed by nine months of home detention in fraud case in which the amount of loss exceeded $1.7 billion dollars).  Nevertheless, even in the absence of a § 5K1.1 departure, the sentences imposed on doctors convicted of health care fraud have been substantial. *See*, *e,g*, *United States v. Christensen*, Case No. 6:15-cr-00153-CEM-GJK (M.D. Fla. 2016)(imposing sentence of one-year of imprisonment for West Palm Beach physician convicted of defrauding Medicare of $1,101,919).

In light of these cases, as well as the national statistics demonstrating consistent and substantial variances in fraud cases, Dr. Mendez submits that a variance in his case is appropriate in order to avoid unwarranted sentence disparities.

**7.     The Need to Provide Restitution to Any Victims of the Offense.**

Although restitution is applicable in this case, a non-imprisonment sentence Dr. Mendez will allow him to repay his significant restitution.

## CONCLUSION

As the foregoing establishes, the unique circumstances presented in Dr. Mendez's case warrant a variance below the applicable guideline range. Because the decision in *Booker* has made the Guidelines advisory and the parsimony clause of 18 U.S.C. § 3553(a) the paramount consideration, Dr. Mendez respectfully submits that a variance is appropriate pursuant to this

significant and paramount sentencing statute.


Respectfully submitted,

**RICHARD G. LUBIN, P.A.**
Second Floor, Flagler Plaza
1217 So. Flagler Drive, Second Floor
West Palm Beach, FL 33401
Phone: (561) 655-2040
Fax: (561) 655-2182
Co-Counsel for Defendant Joaquin Mendez

*/s/ Richard G. Lubin*
Fla. Bar No. 0182249


**THE HEALTH LAW OFFICES OF
ANTHONY VITALE**
2333 Brickell Ave. Ste. A1
Miami, FL 33129-2497
Phone: (350) 358-4500
Fax: (305) 358-5113
Co-Counsel for Defendant Joaquin Mendez

*/s/ Anthony C. Vitale*
Florida Bar No. 249841

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 31st day of October 2017, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

> **RICHARD G. LUBIN, P.A.**
> Second Floor, Flagler Plaza
> 1217 So. Flagler Drive, Second Floor
> West Palm Beach, FL 33401
> Phone: (561) 655-2040
> Fax: (561) 655-2182
> Co-Counsel for Defendant Joaquin Mendez
>
> */s/ Richard G. Lubin*
> Fla. Bar No. 0182249